351 P.2d 624

Joseph H. DUPLER, L. Howard Marcus, B.
M. Roe and David I. Zinik, Plaintiffs
and Appellants,

v.

Maurice YATES, Defendant and
Respondent.

No. 9048.

Supreme Court of Utah.

April 25, 1960.

Rawlings, Wallace, Roberts & Black, Samuel Bernstein, Salt Lake City, for appellants.

Gustin, Richards & Mattsson, Halliday & Halliday, Salt Lake City, for respondent.

CALLISTER, Justice.

Plaintiffs filed this action on October 21, 1957, to recover damages from the defendant for alleged fraud and deceit and breach of a fiduciary relationship. Upon motion of the defendant, plaintiffs' original complaint was dismissed with leave to amend. An amended complaint was filed and defendant, without filing an answer, made motions to dismiss and for summary judgment. The latter motion was granted and judgment entered accordingly. Plaintiffs then made a motion to amend the judgment to permit an amendment to the amended complaint which was denied by the lower court and. they appeal.

The amended complaint contains five causes of action. The first three concern transactions involving the purchase of interests in oil wells from Joe and Leo Aimonetto. The fourth cause concerns the purchase of interests in an oil well from C. B. Simmons. The fifth cause of action combines all of the transactions as included within an alleged fraudulent scheme on the part of the defendant.

In the first cause of action the only plaintiff involved is Dupler. It is alleged that defendant represented to Dupler that an undivided one-fourth interest in an oil

and gas lease in Wyoming would cost $60,000.00; that defendant represented that he had paid $30,000.00 for a one-half of said one-fourth interest; and, that defendant further represented that he was acting for and on behalf of Dupler when, in fact, he was representing himself and the Aimonettos. It is then alleged that these representations were false, which defendant knew, and made for the purpose of inducing plaintiff to pay $30,000.00 to the Aimonettos for one-half of the one-fourth interest; that Dupler, in reliance upon the defendant's representations, paid the $30,000.00 for the one-half of the said one-fourth interest which is of no value; and, that Dupler suffered damage in the amount of $30,000.00. Finally, it is alleged that the defendant was an experienced and successful investor; that he had a fraudulent scheme to induce the public to invest in oil and gas leases wherein he would represent that he, himself, was investing and would fraudulently conceal the fact that he was to receive from the Aimonettos either an interest in the lease or a part of the money paid by the public for inducing them to invest; that Dupler relied upon these representations; and that Dupler would not have invested, without further extensive investigation, had he known defendant was to receive either money or an interest.

Plaintiffs, Dupler, Roe and Zinik, are involved in the transaction set forth in the second cause of action. In this cause of action it is alleged that defendant represented that he had paid the Aimonettos $17,500.00 for an interest in an oil and gas lease, when, in fact, he had not; and that Dupler paid the sum of $17,500.00, Roe $10,500.00, and Zinik $10,500.00 to the Aimonettos and defendant for their interests. Except for the foregoing facts, the other allegations are the same as set forth in the first cause of action.

The third cause of action is substantially the same as the first two. Here, the only plaintiff involved is Dupler. It is alleged that defendant represented he had purchased for Dupler a five per cent (5%) interest in an oil well from the Aimonettos and a five per cent (5%) interest for himself; that he had made the payments of $7,000.00 for both Dupler and himself; that the representations were false; and that Dupler, in reliance thereon, paid defendant $7,000.00. Further allegations are the same as those contained in the first and second causes of action.

The fourth cause of action relates to a transaction with one C. B. Simmons and involves all of the plaintiffs. It is alleged that defendant represented that a fifty (50%) per cent working interest in an oil well could be purchased from Simmons; that defendant falsely represented that he had paid $15,500.00 for a ten per cent (10%) interest; and, that upon reliance thereon the plaintiffs paid to Simmons and

defendant as follows: Dupler $15,500.00, Marcus $15,500.00, Zinik $11,625.00 and Roe $19,375.00. Again the allegations relating to defendant's representations, actions, and scheme are the same as those set forth in the first cause of action.

In the fifth cause of action all of the foregoing transactions are alleged as part of an overall scheme on the part of the defendant to act as an agent, representative and partner for plaintiffs and then, in fact acting for himself and the sellers of the interests, thereby and thus by his representations inducing plaintiffs to spend money for valueless interests.

In all causes of action it was alleged that the plaintiffs did not discover the facts constituting the frauds until June of 1956.

The defendant, in support of his motion for summary judgment, filed numerous affidavits and exhibits. Several of the affidavits submitted by the defendant were to the effect that the plaintiffs knew of the alleged fraud more than three years prior to the commencement of this action, thus being barred by the statute of limitations.[1] On this issue the plaintiffs submitted counteraffidavits, but submitted nothing to refute or explain issues presented by the other affidavits and exhibits of the defendant.

The major portion of defendant's affidavits and exhibits relates to four court proceedings in the District Court of the United States for the District of Wyoming. These cases were filed prior to the commencement of this action.

The first of the Wyoming cases was filed February 7, 1955, (Civil No. 3851) by Dupler against Joe and Leo Aimonetto. It concerned the same interests purchased by Dupler as contained in the first three causes of the present action. Subsequently, on February 24, 1955, Roe and Zinik each filed a complaint (Civil Cases No. 3858 and 3859) against the Aimonettos concerning the same interests purchased by them as set forth in the instant second cause of action. Certified copies of the complaints in these three actions were made exhibits in support of the motion for summary judgment.

These actions were based upon the Securities Act of 1933, as amended.[2] In each case the plaintiffs therein, Dupler, Roe and Zinik, elected to rescind the transactions, offered to reassign the interests to the Aimonettos, and prayed for a judgment entitling them to recover the moneys paid by them. Dupler, in his complaint, alleged in part as follows:

"(a) On or about December 20, 1953, defendant Joe Aimonetto represented in person to plaintiff, * * * as an inducement to get plaintiff to purchase the securities described above, that

---

1. 78–12–26(3) U.C.A.1953.

2. 15 U.S.C.A. § 77a et seq.

Well No. 1, which was drilled by defendants on the SW¼ SE¼ of Section 11, * * * had a greater prospective income producing power than it had in truth and in fact.

"(b) At the time and place aforesaid, defendant Joe Aimonetto represented to plaintiff that Well No. 1 had a value greater than it had in truth and in fact.

"(c) At the time and place aforesaid, defendant Joe Aimonetto represented in person to plaintiff that Well No. 1 was producing at a rate greater than it was in truth and in fact.

* * * * * *

"(k) On or about February 14, 1954, defendants represented in person to plaintiff that an equal undivided fractional working interest in said lease had been sold to another for a consideration identical to that which was paid to defendants by plaintiff, and which representation was false.

* * * * * *

"(p) Between February 8, 1954, and May 1, 1954, defendants represented to plaintiff on several occasions that Well No. 2, which was drilled by defendants on the SW¼ SW¼ Section 2, Township 41 North, Range 66 West, a part of said lease, had a producing potential and capacity equal to or in excess of, and would produce as much oil, if

not more, than Well No. 1, when, in truth and in fact, Well No. 2 was so drilled or so located as to have a much smaller potential and capacity.

"(q) On or about March 5, 1954, when defendants sold plaintiff an undivided 5% working interest in and to said lease as to the lands last above described, defendants omitted to state or disclose to plaintiff that an additional five per cent undivided interest in the same lands was being assigned to a third person as a commission for the sale of said security to plaintiff."

In his complaint against the Aimonettos, Roe, among others, made the following allegations:

"(a) On or about February 22, 1954, at a time when plaintiff and defendant Joe Aimonetto were present in Las Vegas, Nevada, and, again, on or about February 27, 1954, and on or about March 5, 1954, by means of written assignments respectively dated February 25, 1954, and March 5, 1954, * * * defendants represented to plaintiff a greater ownership and interest in * * Lease Serial No. Wyoming 013425, covering, among other lands, the SW¼ SW¼ of Section 2, * * * than they, in truth and in fact, had.

* * * * * *

"(c) On or about February 22, 1954, at which time defendants sold plain-

tiff an undivided five percent (5%) working interest * * *' and again, on or about March 5, 1954, at which time defendants sold plaintiff and undivided two and one-half percent (2½%) working interest * * * defendants omitted to state to plaintiff that said lease was subject to certain royalties, overriding royalties, free interests, drilling requirements and other burdens and omitted to state that a part of the working interest therein was owned by persons other than defendants.

\* \* \* \* \* \*

"(e) On or about March 5, 1954, when defendants sold plaintiff an undivided two and one-half percent (2½%) working interest in and to said lease as to the lands above described, defendants omitted to state or disclose to plaintiff that an additional fractional undivided interest in the same lease and lands was being assigned to a third person as a commission for the sale of said security to plaintiff.

"(f) On or about February 22, 1954, defendant Joe Aimonetto represented in person to plaintiff at Las Vegas, Nevada that Well No. 2, which was to be drilled by defendants * * * had a producing potential and capacity equal to or in excess of, and would produce as much oil, if not more, than Well No. 1, when in truth and in fact,

Well No. 2 was so drilled or so located as to have a much smaller potential and capacity * * *."

Zinik's complaint contains substantially the same allegations as that of Roe's.

As an exhibit, defendant submitted an agreement dated August 20, 1956, between the Aimonettos and Dupler, Roe and Zinik. This agreement, later ratified by Marcus, contained the following provision:

"Upon the signing of this agreement, the Aimonettos shall cause all steps to be undertaken and diligently prosecuted as may be necessary to carry out the intent of this agreement, and in consideration thereof and of the covenants of the parties hereto, it is expressly understood and agreed that all claims and accounts existing between said parties up to and including date hereof are hereby discharged, released, settled, and compromised; and that the above-mentioned civil cases shall be dismissed with prejudice."

Subsequently, on October 25, 1956, these three Wyoming actions were dismissed with prejudice upon written stipulation of the parties.

On March 30, 1955, Dupler, Roe, Zinik, and Marcus filed an action in the District Court of the United States for the District of Wyoming against C. B. Simmons, individually, Edward Kellar, individually, and Simmons and Kellar, a partnership.

This action was also brought under the Securities Act of 1933 and was similar to those brought against the Aimonettos. It concerned the same interests purchased by the plaintiffs as contained in the fourth cause of the instant action. Plaintiffs were awarded a judgment against the named defendants entitling them to rescind the transactions and for a recovery of the moneys paid.[3] An appeal by the defendants to the Tenth Circuit Court of Appeals was, upon stipulation of the parties, dismissed on February 26, 1959.[4] The complaint against Simmons et al. contained the following pertinent allegations:

"(a) On or about March 26, 1954, as an inducement to plaintiffs to buy the securities hereinabove described, defendants represented and warranted to plaintiffs at Newcastle, Wyoming that, in drilling a well, hereinafter identified as Well No. 3, * * * defendants would employ a special device, for which they had the exclusive use, and that this special device when used in drilling Well No. 3 would make five oil well openings instead of one in Well No. 3, which representation, in truth and in fact, was false. This special device was never used by defendants in drilling Well No. 3.

\* \* \* \* \* \*

"(c) At the time and place last stated, defendants, in order to induce plaintiffs to purchase the securities hereinabove alleged, represented to plaintiffs that Well No. 3 when drilled, would produce over 1,000 barrels of oil per day, which representation, in truth and in fact, was false.

\* \* \* \* \* \*

"(g) On or about March 26, 1954, defendants represented to plaintiffs at Newcastle, Wyoming that after the total consideration of $62,000.00 had been paid by plaintiffs to defendants for their respective interests in said lease plaintiffs would receive a 100% return on their investments within 18 months, which representation, in truth and in fact was false."

A certified copy of this complaint was submitted below in support of defendants' motion for summary judgment. Also submitted were portions of the deposition of Dupler and portions of the testimony given at the trial of the Simmons action by Dupler, Roe, Zinik and Marcus.

In his deposition, Dupler testified in part as follows:

"Q. Now Mr. Dupler, * * * when did you first meet Mr. Simmons? A. Some time in March, 1954, the latter part of March.

---

3. Dupler v. Simmons, D.C., 163 F.Supp. 535.

4. 268 F.2d 217.

"Q. Where was that? A. At the Antlers Hotel.

"Q. And how long had you been in Newcastle at that time before you met Mr. Simmons? A. I believe we got in that day, some time during the day.

"Q. Who do you mean by 'we'? A. With a party by the name of Howard Marcus.

"Q. Who is he? A. He's one of the men that has an interest in—

"Q. I see, one of the plaintiffs in this case, and what was the purpose of your going to Newcastle at that time? A. We had an interest at that time in a couple of oil wells.

"Q. Was that the Aimonetto stuff? A. Yes.

"Q. How long before this time did you acquire the interest in the Aimonetto property? A. Well, it was some time in January, I believe.

"Q. Of the same year? A. Yes.

"Q. And was that a completed deal at that time, the Aimonetto deal, or was that still pending? A. When was this?

"Q. At the time you met Mr. Simmons? A. That was completed.

"Q. The Aimonetto deal? A. Yes.

\* \* \* \* \* \*

"Q. Who is Mr. Yates? A. He's a party that has an interest in this oil well.

"Q. Is he connected in this lawsuit? A. He's not connected with the lawsuit, but he has an interest or did have an interest.

"Q. Go right ahead in your own words. A. And then Mr. Simmons started talking to us and he started telling us how bad these Aimonetto boys were and that they are no good, that he wants people to come into Newcastle, he wants them to make some money, and one of his words was, want to put the nose bag on you fellows so you fellows can make some money. I remember that word distinctly.

\* \* \* \* \* \*

the next morning we met with Mr. Simmons, and when I say 'we', Mr. Yates and myself. Mr. Yates stayed there about two minutes and he excused himself, he had some other private business to take care of. Then the conversation started.

"Q. What happened then? A. Mr. Simmons, had two deals. One deal, if I recall correctly, it was a completed well that either 120 acres or 160 acres that he thinks could be bought for about $200,000.00. Then he had this tract which was called No. 3 of 40 acres, and he was talking about that, and he says

260

that that deal is surrounded by big producers and that this tract there with the device that he has exclusive on could be made into the largest producer in the field, and it would produce not less than a thousand barrels of oil per day. He brought out this catalog—well, it was a brochure is what it was, and he showed me the picture of this device, and he says instead of having just one hole, you would have five or six different holes. I don't recall just how many. I know the prongs—I remember it had four prongs on it.

"Q. But it was close to the Aimonetto lease? A. Yes, and that was surrounded by some oil wells, was supposed to have been some big producers, I understood. Now, this could have been later on or that afternoon. Now, I can't recall at this moment.

\* \* \* \* \* \*

"A. All I can tell you is that I know I was out there, and whether it was that day or maybe a week or two or three later, but I imagine it was that day because I was impressed with all these oil wells around this 40 acres of land.

"Q. There was nothing on the 40 acres at that time? A. No, sir.

"Q. You saw the other wells? A. They were close by.

\* \* \* \* \* \*

"A. We got back to Salt Lake City, and I met with Dave Zinik, Ben Roe and Howard Marcus.

\* \* \* \* \* \*

"A. And we talked things over, and then we got together—Mr. Yates was back in town and we talked to him. Then, oh, it must have been a week later from the time I left Newcastle, about a week later, Mr. Yates placed a call to Mr. Simmons from Mr. Zinik's office. All the boys were there, and Mr. Simmons wanted $90,000.00 for fifty per cent of the well, and then I took the telephone, and we compromised at $77,500.00, and he told us or he told me rather to have my attorney draw up the papers in Salt Lake City because if he had them drawn up, there may a lot of changes made and so forth back and forth that would delay the starting of this well, so there was papers drawn. They were sent to Newcastle. They were signed, I think by Mr. Simmons. They was returned to Salt Lake City.

\* \* \* \* \* \*

"Q. Go ahead. Then what happened. This agreement was between you and Yates and Simmons? A. No, but I was the agent for Mr. Zinik and Mr. Roe and Mr. Marcus.

"Q. It starts out, in agreement between Mr. C. B. Simmons and Dupler and Yates, the second parties. I see,

the first party agrees to deliver assignments to Dupler, Yates, Marcus, Roe and Zinik—I see. Go ahead. A. I was merely their agent.

"Q. Now, the money was to be put at the bank until the well was drilled? A. Until they—

"Q. Hit the sand? A. The sand.

"Q. Was that done? Was the well drilled? A. Yes, sir.

"Q. Is Yates still in this deal? A. Sir, I couldn't tell you what deal he is in.

"Q. Why was the money turned over? A. Because our agreement was when they hit the sand, that we were supposed to turn the money over.

"Q. So you turned it over in compliance with the agreement then? A. Yes.

\* \* \* \* \* \*

"Q. You say you turned it over— Yates handed you the paper to sign? A. Yes.

"Q. So you relied on Yates who was your partner? A. I didn't rely upon Yates to turn the money over. I saw the Schlumberger.

\* \* \* \* \* \*

"Q. You are saying now that in purchasing this oil, this lease, that you relied upon the use of that device as your reason for participating in the thing, or to what extent did you put it that way? A. To what extent?

"Q. Yes. A. I will give you a simple figure.

"Q. That's what I want. A. Mr. Simmons took out a pencil and paper out of his pocket, or he had a piece of paper lying there, and he says, 'If this oil produced 1,000 barrels of oil per day,' he says, 'I have a contract.' I don't know with who he had it. 'We can get $2.40 or $2.50,' I don't recall the figures, 'for the oil. Within three months to eighteen months, you will get your money out and double it.'

"Q. I see. That's what you relied on then? A. After all was said and done, when a man makes a statement of that type and shows you figures and tells you he has this device and what this is going to be—

"Q. I see, and that was done before the well was started? A. Yes, that's what took place. That's what took place in the room downstairs, not upstairs, downstairs between he and I in the apartment where we were supposed to be. He pulled the pencil and paper out. He's got a contract for all the oil he can deliver, *wheher* $2.40 or $2.50 a barrel, and the well is to produce at least a thousand barrels a day. My God, it was box car numbers, and I didn't know. Maybe he was right

and maybe he was wrong, but I thought he was right. He was an oil man.

"Q. That's what you relied on then? A. Surely.

"Q. Other than that, what other so-called misrepresentations did he make to you or fraudulent statements or things that were wrong outside of that representation there? What else did he say? A. Well, he said so much—he kept on talking.

"Q. That's what I want to find out. A. I can't recall all of the conversation, but he was going to make us fellows rich.

"Q. All right. That's another thing you relied on? A. He was going to make us rich.

"Q. You relied on that? A. That's right.

"Q. He didn't make you rich? A. He didn't make us rich.

"Q. Say, by the way, for the record, who is Mr. Zinik? Give us his name and what he does. I might want to contact him. A. Mr. Zinik is in the sporting goods business. It's about 115 South Main.

"Q. How about Mr. Roe? A. Mr. Roe has offices on the ninth floor in the Deseret Bank Building.

"Q. Salt Lake? A. Yes.

"Q. What does he do? A. He's retired.

"Q. What's your association with them, Mr. Dupler? A. Just personal friends.

"Q. You are not associated with any business venture? A. We could be. I wouldn't say we are not associated. We could be in some other ventures, yes.

"Q. My point is, how did you happen to go back to Salt Lake and look up these two men to share in this venture instead of some other two people? Was there any reason for it? A. Suppose you had a good personal friend that you associated with and you think you got something pretty good?

"Q. Just a personal relationship then? A. Yes.

"Q. No other reason. Are they wealthy men or well-to-do men? A. They are all wealthy men.

"Q. You knew that [they] had the money if you could go ahead with the deal? A. That's right.

"Q. So after this one deal was completed and didn't come up to par or come up to your expectations, that's when you made up your mind you wanted your money back, and from that time on nothing has been done? A. No, sir.

"Q. And that's when the lawsuit was filed? A. That's right."

At the trial of the Simmons action, Dupler testified in part as follows:

"Q. After the conversation over the telephone in Mr. Zinik's store to Newcastle, what did you next do in relation to this deal? Where did you go, what did you do? A. Well, I done nothing any further, Bill.

"Q. Did you go to any lawyers, talk to any people? A. No, I told—I don't recall who it was, Howard or Mr. Roe, they went up to see my attorney, Sam Bernstein. I did not go.

\*　\*　\*　\*　\*　\*

"A. Yes, sir, I paid $15,500.

"Q. When did you pay the first of that? A. Well, the first of it, I believe, was in April, early part of April.

"Q. 1954? A. Yes, sir. I didn't pay it personally, Ben Roe paid it for me.

"Q. Ben Roe advanced it for you? A. He loaned me the money, yes sir.

"Q. Did you subsequently repay him? Yes, sir.

\*　\*　\*　\*　\*　\*

"Q. And Mr. Yates introduced Mr. Simmons to you after he had invited him up? A. Yes, sir.

"Q. And the principal topic of the conversation at that time was the prop-

osition of your deal with the Aimonetto's? A. With who? With Mr. Simmons, you mean.

"Q. Mr. Simmons and Mr. Yates. You and Mr. Marcus and Mr. Simmons and Mr. Yates in this room after midnight on your first meeting. A. I don't recall just exactly what the topic was of Mr. Aimonetto.

"Q. Well, what did you talk about? A. We talked about different things, I know one thing, as I said before, that he was brought up for one reason, to try to prove to us that the Aimonetto's were dishonest.

\*　\*　\*　\*　\*　\*

"Q. And you called Mr. Simmons? A. Yes, sir.

"Q. You are not positive of anything, but you know you talked about the price and had it reduced? A: Well, we had a—we had talked about the whole deal, the whole thing had to be ironed out on the telephone, the whole deal was transacted on the telephone, called for what it states in this contract, and that was the conversation evidently that was on the telephone, because—

"Q. Were you and Mr. Yates subsequently got together in Salt Lake, did you? A. Well, we got together, I believe Howard and I and Mr. Zinik and Mr. Roe got together the following

morning of our arrival and we talked this thing over. Yates did not come back with us. Yates stayed over. I believe it was the next day after Howard and I talked to Zinik and Roe that Yates—we had a meeting with Yates. That was the morning, or I believe that was the day that we called Mr.—

"Q. Well now, Mr. Dupler, what was your relationship with Yates at that time? Were you and Yates partners? A. No, sir."

At the same trial plaintiff Marcus testified in part as follows:

"Q. Did you place reliance on anything other than your own judgment when you became a purchaser of an interest in the lease in question? A. Certainly. I knew nothing about the oil business, so I relied on what I was told by essentially Mr. Simmons.

"Q. You say 'essentially,' what exactly that he told you did you place reliance on? A. I placed reliance on the statement that this would be a minimum of a thousand barrel, a day well, and we would make a great deal of money on this investment if we took it, and that he would use this—this drilling tool that went out in different directions. I relied on those statements.

"Q. Pardon? A. I relied on those statements."

Part of Zinik's testimony given in the Wyoming action is as follows:

"Q. Had you ever met Mr. Simmons before the day of the telephone conversation from your place of business to Newcastle? A. No, sir, I did not, sir.

"Q. When did you first learn of the fact that an interest might be purchased in the 40-acre lease involved in this case? A. When Joe Dupler came from Newcastle.

"Q. And from whom did you learn it? A. From Joe Dupler and Howard—Howard Marcus.

"Q. Did they relate to you anything that purportedly or reputedly had been given to them by Mr. Simmons at Newcastle— A. Yes. * * *

"Q. Yes. And what did they tell you? That is, that they had learned from Mr. Simmons about this property, this 40-acre tract? A. Well, the way they brought it out for me, they learned —they thought it's a very, very good deal and Mr. Simmons is a very fine fellow and knows what he is doing and knows how to drill a well.

"Q. What else? A. And I'm sure we can trust them, and he was going to drill a well entirely different than the others, and so—they explained it to me with these different ways of

drilling it, four or five different ways, that it extends, and that the well is going to bring in at least a thousand barrels of oil a day, and that we get our money out of it within ninety days and we'll more than double our money within a year and a half.

"Mr. Hickey: May I ask the Court, is it now the state of the record admitted that Dupler and Marcus and Yates were the agents of Zinik and Roe? Is that the theory that this is going in on?

"Mr. Brown: I don't think there is any theory that Yates was an associate at all. It isn't intended by us.

\* \* \* \* \* \*

"Q. Now, Mr. Zinik, I am going to ask you this. At the time you elected to go into this venture, which I take from your testimony to be at the time of the telephone call or about that time, did you rely upon anything other than your own knowledge of the area where the oil was located? A. Yes, sir.

"Q. Did you have any independent knowledge of the oil activities around Weston County, Wyoming? A. Absolutely nothing.

"Q. None at all? A. No.

"Q. Upon what did you rely in making that investment? A. Well, I relied on Mr. Simmons. It was brought out that he was an honest fellow and we can trust him—

"Q. Did you place any reliance upon what Mr. Dupler and Mr. Marcus reported to you as the representations of Mr. Simmons at the time you elected to go into this transaction? A. I did.

"Q. Is that all that you relied upon in going into it? A. That's right."

Plaintiff Roe also testified and stated in part as follows:

"Q. Now coming back to the meeting in the Mayflower Cafe, did Mr. Dupler or Mr. Yates advise you or state to you things which were reported to you as representations of Mr. Simmons in respect to the oil and gas lease involved in this case? Just yes or no. A. Yes. With—may I make this correction, please?

"Q. Yes. A. Mr. Yates was not present.

"Q. I am sorry, I misnamed the parties. A. Yes.

"Q. Present besides yourself and Mr. Zinik were Mr. Dupler and Mr. Marcus? A. Mr. Dupler, Marcus, Zinik and I.

"Q. And was it Mr. Dupler and Mr. Marcus who had been to Newcastle, is that right? A. Right.

"Q. Now did they advise you, those who had been and just returned from Newcastle, did they (quote) to you anything that Mr. Simmons represented about the oil and gas lease involved in this case? Just yes or no. A. Yes.

\* \* \* \* \* \*

"A. One of the first things that was relayed to me that Mr. Simmons is an oil and gas man, he knows a great deal about oil and gas. Mr. Simmons told them that that piece of property—the description of which I don't know—is a very fine piece of property, it will be one of the finest wells in that part of the country, that they contemplate using a special tool that has recently been patented and he had the right to use it, and the—to be expected that a well will be in excess of a thousand barrels a day, it will pay out in three months and maybe double in eighteen months. It is going to be the biggest well in that part of the country.

"Q. Did you place any reliance on these quoted statements at the time you entered into this venture? A. Naturally.

\* \* \* \* \* \*

"Q. Now I understand from your testimony, that you became interested in what has been referred to here as the Aimonetto leases and that you became interested in those the latter part of February or early part of March, 1954, is that correct? A. That's right, sir.

"Q. Now isn't it a fact that you became interested in those through representations made by Mr. Joe Dupler? A. No, sir.

"Q. Well, who made the representations that interested you in those? A. The day happened to be Washington's Birthday, 22nd of February, I happened to be in Las Vegas, Nevada, and there I met one of the Aimonetto boys and Mr. Yates, and I talked to them about it and they were telling me that Joe Dupler and—well, the family, has made a little investment in it, so we kept on talking, and I had been away and I took the telephone and I talked to Joe Dupler in Palm Springs, California, and just asked him what did he think about it or what did he know about it. He said, 'Well, I don't know much about it except I put up my money.' I say, 'Well, I go back, maybe I will invest a little money.' Which I did.

"Q. Now did anyone tell you, Mr. Roe, that the Newcastle country in Wyoming was generally booming and making a lot of money in oil? A. I don't recall at that time in February when I was in Las Vegas anybody telling me that.

"Q. Now you testified as to the persons upon whom you relied for this particular venture. That is, the Taylor No. 34 venture. A. Yes, sir.

"Q. I think you said you relied upon the statements made by Mr. Marcus and Mr. Dupler with regard to the representations they made about Mr. Simmons. A. That's right, sir.

"Q. Well, I'll try to rephrase it. Did Mr. Marcus tell you he had no more knowledge of Mr. Simmons than what he had acquired in several meetings in a twenty-four hour period? A. That's right.

"Q. You know that he didn't know him very well? A. Well, only to the extent he told us.

"Q. Well now, what did Mr. Dupler tell you about how long he had known him? A. He has known him about that length of time or longer, I don't recall just exactly, and he told me and he told the group that to the best of his knowledge the gentleman in question, Mr. Simmons—first, that he knew the oil business, second, he was honorable. Those two things was the most important information I received. Those two things I based my decision, those are very important facts.

"Q. Yes, sir. Now you were relying on what Marcus and Dupler said,

you had never seen Simmons, isn't that correct? A. That's right, sir.

"Q. So you placed all your reliance on the statements made by Mr. Dupler and Mr. Marcus, is that correct? A. Right, sir."

■ In an action in deceit based upon misrepresentation the plaintiff must plead and prove, among other things, that he relied upon the representations and was thereby induced to act to his injury and damage.[5] Although these essential elements are alleged in the unverified amended complaint, the evidence submitted by the defendant controverts these allegations.

The complaints in all four of the Wyoming cases allege in substance that the plaintiffs were induced to purchase their interests in reliance upon false representations made by the sellers. In each instance the plaintiffs alleged a direct contact with the sellers, and no mention was made of the defendant. Typical, is Dupler's complaint, wherein he alleged that "(a) On or about December 20, 1953, defendant Joe Aimonetto represented in person to plaintiff, * * * as an inducement to get plaintiff to purchase the securities described above, that Well No. 1 * * * had a greater prospective income producing power than it had in truth and fact."

The pleadings and testimony show that plaintiffs relied on the Wyoming defendants

5. Pace v. Parrish, 122 Utah 141, 247 P.2d 273.

in consummating the transaction that caused the damage alleged in the fourth cause of action. Portions of the testimony indicate exclusive reliance on others than the present defendant Yates.

 In attempting to show lack of reliance, defendant has the difficult task of proving the negative of facts that plaintiffs have an affirmative burden to prove at trial. The quantum of proof to show nonexistence of a material fact is of necessity less than that required to prove a matter of affirmative defense. In contrast to self-serving declarations usually proffered by movants for summary judgment, these statements are made by the opposing parties themselves. Presenting at most improbable questions of credibility, these documentary statements have a high degree of probative value. Furthermore, knowledge of reliance or lack of it is within the peculiar province of the plaintiffs. It is not practicable to expect the defendant to present more convincing proof than these contradictory assertions by those who know the most concerning the question of reliance. As a matter of law, it is conceivable that a person might simultaneously rely on misrepresentations of divergent defendants. However, standing alone, admissions by plaintiffs that they relied on others is sufficient proof to negative reliance on the present defendant.

Furthermore, the record contains the agreement of August 20, 1956, between the plaintiffs and the Aimonettos. This agreement provided for a settlement and release of all existing claims and for a dismissal with prejudice of the pending civil cases. These cases were dismissed with prejudice, by written stipulation of the parties on October 25, 1956.

Plaintiffs secured a judgment in the Wyoming case against Simmons, et al. An appeal from this judgment was subsequently, upon written stipulation, dismissed with prejudice.

The settlement agreement, the judgment against Simmons, and the subsequent dismissals with prejudice of both of those actions raise the inference that plaintiffs are fully compensated for the damages they now seek to recover from defendant Yates. Plaintiffs elected to make no affirmative showing with respect to this issue, although they did file counteraffidavits on the matter of the statute of limitations. Thus, from anything that appears in this record, it must be assumed that the claims for damages which they now assert against Yates were satisfied in those Wyoming actions.

We have then an unverified amended complaint aligned against admissible evidence in support of a motion for summary judgment and which if uncontroverted, would entitle the defendant to a judgment as a matter of law. Under such circumstances, is there a genuine, material issue

of fact presented to preclude the granting of the motion?

Rule 56(c) of the Utah Rules of Civil Procedure is identical with the same numbered rule of the Federal Rules of Civil Procedure. It provides, in part, as follows:

"* * * The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judment as a matter of law. * * *"

The primary purpose of the summary judgment procedure is to pierce the allegations of the pleadings, show that there is no genuine issue of material fact, although an issue may be raised by the pleadings, and that the moving party is entitled to judgment as a matter of law.[6]

It is apparent here that the defendant has produced evidence that pierces the allegations of the complaint. The plaintiffs have not controverted, explained or destroyed that evidence by counteraffidavit or otherwise. They have relied upon their amended complaint and their proposed amendment to the amended complaint.

Certainly, if the summary judgment procedure is to be effective, it must be held that when adequate proof is submitted in support of the motion, the pleadings are not sufficient to raise an issue of fact.[7]

Rule 56 U.R.C.P. is not intended to provide a substitute for the regular trial of cases in which there are disputed issues of fact upon which the outcome of the litigation depends. And it should be invoked with caution to the end that litigants may be afforded a trial where there exists between them a bona fide dispute of material fact.[8] However, where the moving party's evidentiary material is in itself sufficient and the opposing party fails to proffer any evidentiary matter when he is presumably in a position to do so, the courts should be justified in concluding that no genuine issue of fact is present, nor would one be present at the trial.[9]

Upon a motion for summary judgment, the courts ought to recognize, as a minimum, that the opposing party produce some evidentiary matter in contradiction of

6. 6 Moore, Federal Practice (2d Ed.) p. 2066; Engl v. Aetna Life Ins. Co., 139 F. 2d 469.
7. Asbill & Snell, Summary Judgment Under the Federal Rules, 51 Mich.L.Rev. 1143, 1155 (1953); 3 Barron & Holtzoff, Federal Practice and Procedure 82.
8. James v. Honaker Drilling, Inc., 10 Cir., 254 F.2d 702, 706.
9. 99 Univ.Pa.L.Rev. 212, 223 (1950).

the movant's case or specify in an affidavit the reason why he cannot do so.[10]

Where, as in the instant case, the materials presented by the moving party are sufficient to entitle him to a directed verdict and the opposing party fails either to offer counteraffidavits or other materials that raise a credible issue or to show that he has evidence not then available, summary judgment may be rendered for the moving party.[11]

The record made by the defendant, in support of his motion for summary judgment, controverted the unverified allegations in the plaintiffs' amended complaint and therefore, in the absence of counteraffidavits, no genuine issues of material fact were created.[12]

Plaintiffs complain that the lower court erred in denying their motion to amend the judgment to allow an amendment to the amended complaint. The proposed unverified amendment does not present a new theory, nor does it contradict or explain the materials in support of the defendant's motion for summary judgment. It merely sets forth in greater detail the alleged fraud and deceit.

While Rule 15(a) U.R.C.P. provides that leave to amend "shall be freely given when justice so requires," the liberality of the rule is not without limit, particularly when nothing new or of substance is contained in the proposed amendment.[13] The permitting of amendments to pleadings rests in the sound discretion of the trial court and we find no abuse of that discretion in this case.

Furthermore, an unverified amendment of a pleading should not be allowed to defeat a motion for summary judgment if the amendment does not effect any substantial change in the issues as they were originally formulated in the pleadings.[14]

Judgment affirmed. Costs to respondents.

CROCKETT, C. J., and HENRIOD and McDONOUGH, JJ., concur.

WADE, Justice (dissenting).

I dissent.

Under Rule 56 of Utah Rules of Civil Procedure, Subdivision (c) a summary judgment should be rendered forthwith only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine is-

10. Id. at page 228.
11. 6 Moore, Federal Practice (2d Ed.) p. 2067; James v. Honaker Drilling, Inc., supra, note 8.
12. Geller v. Transamerica Corp., D.C.Del. 1943, 53 F.Supp. 625, 629; Leonardi v. Furman, 83 Ariz. 61, 316 P.2d 487, 491.

13. Davis Stock Co. v. Hill, 2 Utah 2d 20, 268 P.2d 988.
14. 6 Moore, Federal Practice (2d Ed.) p. 2016.

sue as to any material fact *and that the moving party is entitled to a judgment as a matter of law."* This rule should be kept in mind in passing on this kind of a motion. Otherwise, trial courts will be deciding cases on affidavits and depositions when there should be a regular trial. (Emphasis ours)

As I understand the prevailing opinion it concedes that the plaintiffs' complaint states a claim upon which relief could be granted. It, however, seems to conclude that because of the pleadings and depositions, from other actions by plaintiffs against other defendants, in the absence of contradictory affidavits of plaintiff, that defendant has shown as a matter of law that they were entitled to a summary judgment. With this conclusion I do not agree.

I think that all the depositions and pleadings from the other cases show is that plaintiffs relied on and were induced to make these investments by fraudulent misrepresentation of the defendants in the other actions. However, that does not prove that plaintiffs did not rely on and were not induced by the fraudulent misrepresentations of defendant Yates in this action to make these investments. A party may be induced by and rely on the fraudulent misrepresentation of many different persons. I find nothing in the depositions or pleadings which shows as a matter of law or even indicates strongly that plaintiffs did not rely on and were not induced by the fraudulent misrepresentations of defendant to make these investments.

Nor does the fact that plaintiffs made compromise settlements with the defendants in the other action preclude plaintiffs from recovering against this defendant. Just as in a negligence action, the negligence of more than one person may proximately cause an injury so in an action for damages from fraudulent misrepresentation a person may be induced to make an investment by fraudulent misrepresentations of more than one person. A compromise settlement of the claim of a plaintiff in a fraudulent misrepresentation case does not preclude his recovery from defendants in other cases. Such a settlement by a plaintiff merely means that he has obtained at least part of the damage which he claimed from the persons with whom he makes the compromise. And, of course, as to such persons, it precludes him from further recovery. However, recovery from one defendant for fraudulent misrepresentation does not preclude the plaintiff in such action from recovering any unpaid portion of the damage which he suffered from another defendant in another action. However, the amount which he recovered in the other action would have to be taken into consideration and applied as a part payment of the damages which he sustained.[1]

1. Green v. Lang Co., 115 Utah 528, 206 P.2d 626.