Debra KING, et al., Plaintiffs
and Appellant,

v.

SEARLE PHARMACEUTICALS, INC., a
foreign corporation, and Doran V.
Porter, M.D., Defendants and Appellee.

No. 880214.

Supreme Court of Utah.

April 14, 1992.

Wayne B. Watson, Provo and Terri C. Bingham, Orem, for Debra King.

J. Anthony Eyre, Heinz J. Mahler, Salt Lake City, for Searle Pharmaceuticals.

David W. Slagle, Salt Lake City, for Doran V. Porter.

STEWART, Justice:

This is an appeal from a summary judgment in favor of defendant Searle Pharmaceuticals, Inc., and against plaintiff Debra King on her claims against Searle based on

strict liability and negligence for personal injury. The trial court ruled that plaintiff failed to demonstrate a material issue of fact as to whether Searle caused the alleged injury. The trial court certified its judgment pursuant to Rule 54(b) of the Utah Rules of Civil Procedure. Plaintiff's action against Dr. Doran V. Porter remains in the trial court. The summary judgment was properly certified because all claims against Searle were finally adjudicated by the trial court.

King contends that the trial court erred in granting summary judgment because the doctrine of res ipsa loquitur established a prima facie case of liability against Searle and therefore raised a material issue of fact as to causation with respect to both claims against Searle.

## I. FACTS

In January 1983, Dr. Doran V. Porter implanted in King's uterus an intrauterine contraceptive device (IUD) known as the Cu–7. The Cu–7 was designed, manufactured, and marketed by Searle. Dr. Porter testified on deposition that he had examined King two weeks after the implantation and that he thought the device was then in a proper position. Approximately a month and a half later, King became pregnant. When Dr. Porter attempted to locate and remove the device, he could not find it. In May 1983, King had a spontaneous abortion and was admitted to a hospital to remove the Cu–7. In an exploratory laparoscopy, the Cu–7 was found outside the uterus in her abdominal cavity and removed.

King filed suit against Dr. Porter for medical malpractice and against Searle for negligence and strict liability. Searle filed a motion for summary judgment supported by an affidavit from Dr. Howard G. McQuarrie, a physician specializing in obstetrics and gynecology, who had reviewed plaintiff's medical records and various depositions taken in the case. Dr. McQuarrie had also conducted clinical research on the Cu–7 prior to its approval by the Food and Drug Administration, had used the device in his clinical practice, and had reviewed

numerous articles, publications, and reports concerning the Cu–7 and other IUD contraceptive devices. He concluded generally that the Cu–7 was neither defective nor unreasonably dangerous and, specifically, that King's injury was not caused by "any negligence or other fault on the part of Searle." His affidavit also asserted that "perforation of the uterus by the Cu–7 at the time of insertion can occur in the absence of negligence or fault on the part of the treating physician or any other party."

In opposition to Searle's motion for summary judgment, plaintiff filed the affidavit of Robert E. Baier, Ph.D., the director of the Health–Care Instruments and Devices Institute at the State University of New York at Buffalo. Dr. Baier's affidavit stated that he had performed laboratory studies to determine the effect of pure metallic copper on animal tissue by implanting copper under the skin of New Zealand white rabbits and that the copper had perforated the skin of the rabbits within twenty days. Dr. Baier asserted that the "copper contained in the Cu–7 intrauterine device has an almost identical effect upon the tissues of the human female, and this effect permits the device to perforate the uterus and migrate to other parts of the body." He also opined that the Cu–7 is "an inherently dangerous device inappropriate for implantation in the female uterus."

In ruling on Searle's motion for summary judgment, the trial court observed that Dr. Baier had not examined plaintiff or any of her medical records and did not know any of the particular facts concerning her complication. The trial court granted Searle's motion, holding that Dr. Baier's affidavit failed to raise a genuine issue of fact as to whether the Cu–7 was the cause in fact of plaintiff's injury. The trial court ruled that even if one assumed that Dr. Baier's affidavit raised an issue of fact as to whether the Cu–7 was inherently dangerous, that would not be sufficient to avert summary judgment because Dr. Baier's "affidavit does not, nor has plaintiff through any other means attempted to establish through credible evidence that the

Cu–7 caused any injury or damage to the plaintiff."

King states that the issue on appeal is whether the trial court erred "in determining the degree of causal proof required to establish a prima facie case as to Searle Pharmaceuticals." A more correct statement of the issue, however, is whether King has established a factual dispute as to the cause in fact of her injury. King apparently phrases the issue as she does because her expert's affidavit did not state that Searle's product, the Cu–7, in fact caused King's injury. To bridge the factual gap as to causation, King asserts that she raised a factual issue as to Searle's responsibility for the injury under the doctrine of res ipsa loquitur by showing that "(1) King was injured by the Cu–7; (2) the Cu–7 was under the exclusive control of the defendants, [and] (3) absent negligence, either in design or implantation, the Cu–7 should not have perforated King's uterus."

To place the issue in proper focus, we emphasize that whether Dr. Porter was negligent in implanting the IUD was not an issue presented to the trial court on Searle's motion for summary judgment and is not now an issue on appeal. Furthermore, although plaintiff alleges that she was injured by the Cu–7, that fact has yet to be established. Plaintiff's spontaneous abortion could theoretically have been caused by an inherent defect in the IUD, by the manner in which Dr. Porter implanted it, or by some other means.

Plaintiff now concedes that Dr. Baier's affidavit did not create a factual issue as to whether Searle's design or production of the Cu–7 was the cause of her injury. She contends, however, that it is unfair to require her to adduce direct evidence of causation because it is impossible to do so and that the doctrine of res ipsa loquitur is sufficient to create a factual inference of

product defect or negligence by Searle sufficient to preclude summary judgment.

## II. RES IPSA LOQUITUR

▮▮▮ Res ipsa loquitur is essentially an evidentiary rule that allows an inference of negligence to be drawn when human experience provides a reasonable basis for concluding that an injury probably would not have happened if due care had been exercised. *Ballow v. Monroe*, 699 P.2d 719, 721 (Utah 1985); *see also Anderton v. Montgomery*, 607 P.2d 828, 833–34 (Utah 1980). Since res ipsa loquitur generally raises only an inference and not a presumption of negligence, the fact finder may choose either to accept or reject that inference. *Ballow*, 699 P.2d at 723; *Kusy v. K–Mart Apparel Fashion Corp.*, 681 P.2d 1232, 1235 (Utah 1984).[1]

▮▮ The doctrine of res ipsa loquitur requires a plaintiff to establish a foundation from which an inference of negligence can be drawn. That foundation is usually established by proving the following three elements:

(1) the accident was of a kind which, in the ordinary course of events, would not have happened had the defendant used due care;

(2) the agency or instrumentality causing the accident was at the time of the accident under the exclusive management or control of the defendant; and

(3) the plaintiff's own use or operation of the agency or instrumentality was not primarily responsible for the accident.

*Ballow*, 699 P.2d at 721; *Kusy*, 681 P.2d at 1235; *Anderton*, 607 P.2d at 833.

▮▮ The second element, exclusivity of management or control, should not be rigidly applied. Rather, that element should focus on the degree of a defendant's management or control necessary to provide a persuasive inference of liability on

---

**1.** The doctrine of res ipsa loquitur has given rise to some confusion. Professor Prosser states that the doctrine "has been the source of so much trouble to the courts that the use of the phrase itself has become a definite obstacle to any clear thought, and it might better be discarded entirely." William L. Prosser, *Handbook* *of the Law of Torts* § 39, at 213 (4th ed. 1971) (footnote omitted); *see also Potomac Edison Co. v. Johnson*, 160 Md. 33, 40, 152 A. 633, 636 (1930) (Bond, C.J., dissenting) ("It adds nothing to the law, has no meaning which is not more clearly expressed for us in English, and brings confusion to our legal discussions.").

the defendant's part. In other words, something less than exclusive management or control may suffice to make out a prima facie case of res ipsa loquitur. To establish the second requirement, the plaintiff need only show "that it is more likely than not that the defendant was the party responsible for the injury." *Ballow*, 699 P.2d at 721. Thus, the fact that Searle did not have exclusive management or control of the Cu–7 at the time critical to the events causing plaintiff's injury does not necessarily prevent plaintiff from establishing a prima facie case of liability based on res ipsa loquitur if the circumstances of the case otherwise raise a reasonable inference that Searle was liable under either products liability or negligence law.

■ Ultimately, however, to establish a res ipsa loquitur case, the plaintiff must lay a foundation from which it can be established that negligence was probably the cause of the injury. The law is clear that an undesired complication or result from medical treatment does not by itself imply that the result was caused by someone's breach of a duty of due care. *Talbot v. Dr. W.H. Groves' Latter–Day Saint Hosp. Inc.*, 21 Utah 2d 73, 75, 440 P.2d 872, 873 (1968).

■ In ordinary res ipsa loquitur cases, the foundation from which a logical conclusion can be drawn that an injury was probably caused by negligence is the common knowledge and experience of the community with respect to how such events generally occur. *Ballow*, 699 P.2d at 722. In some kinds of cases, however, the circumstances giving rise to the injury and the probabilities that the causative factors were created by a breach of legal duty are outside the realm of the common knowledge and experience of lay persons. Even so, occasionally the state of the art or technology causing an injury may pass from the realm of expert evidence into the realm of common knowledge and experience. As we stated in *Ballow*:

> The probability that an accident was caused by negligence may depend upon the state of the art or technology associated with the instrumentality causing an

injury. For example, the current safety record for aircraft has been held to justify the application of the *res ipsa loquitur* doctrine to unexplained plane crashes. In earlier aviation cases, the courts did not apply the doctrine to unexplained crashes because the then current state of the art did not justify an inference of negligence.

699 P.2d at 722 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 39, at 246 (5th ed. 1984)). However, when the circumstances and the probabilities as to the causative factors of an accident lie within the ken of experts, expert evidence is necessary to establish a foundation that gives rise to an inference of negligence. *Ballow*, 699 P.2d at 722.

■ In most medical malpractice cases, the common knowledge of lay persons does not provide a valid foundation for determining whether res ipsa loquitur provides an adequate basis for a valid inference of negligence. *See Nixdorf v. Hicken*, 612 P.2d 348, 353 (Utah 1980); *see also Robinson v. Intermountain Health Care, Inc.*, 740 P.2d 262, 265 (Utah Ct.App. 1987). An undesired result produced by a medical procedure might appear to a lay person to be caused by negligence, when in fact that is not the case. *See Nielsen v. Pioneer Valley Hospital*, 830 P.2d 270, 274 (1992). Accordingly, expert evidence is usually necessary to establish either direct evidence of malpractice or a foundation for a legitimate res ipsa inference, "because the nature of the [medical] profession removes the particularities of its practice from the knowledge and understanding of the average citizen." *Nixdorf*, 612 P.2d at 352.

■ Of course, in some medical malpractice cases, common knowledge and experience of lay persons is sufficient to establish a foundation for a conclusion of negligence. A classic example is leaving a foreign object in a patient's body during surgery. *See Nixdorf*, 612 P.2d at 353. Clearly, a lay person can reasonably and legitimately infer from his or her common knowledge and experience that leaving a

foreign object in a person during a surgical operation is a negligent act. *Id.*

However, even when common knowledge and experience may appear to provide an adequate foundation for drawing an inference of liability, a defendant may challenge the adequacy of that foundation with evidence showing that the drawing of such an inference is actually beyond the realm of common knowledge and experience. Thus, a defendant is entitled to produce expert evidence to that effect. This evidence may show that res ipsa loquitur is not sufficient to defeat a defendant's properly supported motion for summary judgment by demonstrating an absence of a factual issue as to a particular element of negligence.

In *Hunt v. Hurst*, 785 P.2d 414 (Utah 1990), we dealt with the adequacy of a plaintiff's res ipsa loquitur theory as a defense to a defendant's motion for summary judgment in a medical malpractice case. The defendant supported its motion for summary judgment with expert evidence stating that the undesired medical result occurred without negligence. The plaintiff countered with non-expert affidavits asserting negligence. Summary judgment was granted for the defendant. On appeal, the plaintiff argued that there was sufficient evidence to demonstrate negligence under the doctrine of res ipsa loquitur. This Court held that res ipsa loquitur did not create a genuine issue of material fact in view of unchallenged expert assertions that the plaintiff's injury could have happened in the absence of negligence.

The instant case also involves an interplay between the doctrine of res ipsa loquitur and expert medical evidence submitted by a defendant in a malpractice case. *Hunt* demonstrates that the mere invoking of res ipsa loquitur in response to a defendant's motion for summary judgment is not sufficient to create a material issue of fact. Otherwise, summary judgment would never be available to a defendant in a res ipsa loquitur case. On the other hand, the standard cannot be so strict as to require a plaintiff relying on res ipsa loquitur to submit an opposing affidavit that asserts with particularity facts that would directly challenge the defendant's factual assertions. Such a requirement would, of course, destroy the utility of res ipsa loquitur. Therefore, we hold that for a plaintiff to raise an issue of material fact in the face of particularized assertions in the movant's affidavit, the res ipsa loquitur inference must be strong enough to survive a motion for a directed verdict at the close of the plaintiff's case. *See, e.g., Dupler v. Yates*, 10 Utah 2d 251, 351 P.2d 624, 637 (1960).

The trial court in this case assumed for purposes of the motion for summary judgment that the Cu–7 was a dangerous product, apparently on the basis of Dr. Baier's affidavit. The court then ruled that plaintiff's response to defendant's motion for summary judgment did not raise an issue of fact as to whether Searle's product caused the injury. On this appeal, plaintiff asserts that res ipsa loquitur is sufficient to bridge the causation gap created by Dr. McQuarrie's affidavit and not responded to directly in Dr. Baier's affidavit.

Searle's expert, Dr. McQuarrie, stated in his affidavit that plaintiff's injury could have occurred absent defendant's negligence. The affidavit further stated that Dr. McQuarrie had examined Dr. Porter's deposition and plaintiff's medical records and that in his professional opinion,

> the complication which developed with respect to the Cu–7 which was inserted into the uterus of the plaintiff, Debra King, by the defendant Doran V. Porter, M.D.[,] was not caused as a result of any defective and unreasonably dangerous condition of the Cu–7 or as a result of any negligence or other fault on the part of Searle.

He also stated that "perforation of the uterus by the Cu–7 at the time of insertion can occur in the absence of negligence or fault on the part of the treating physician or any other party." Dr. McQuarrie's opinions were based in part on his clinical research conducted with the Cu–7 prior to its approval by the Food and Drug Adminis-

tration in 1974 and by his use of the Cu–7 in clinical practice.

In response to Dr. McQuarrie's affidavit, plaintiff submitted Dr. Baier's affidavit which states:

> I have participated in clinical studies to determine the effect of pure metallic copper upon animal tissues. Specifically, I have observed the effect of copper, implanted beneath the skin of New Zealand white rabbits. The copper caused tissue destruction of such gross magnitude that within 20 days the implant perforated the animal's skin and dropped to the floor of its cage.

> It is my opinion that the copper contained in the CU–7 intrauterine device has an almost identical effect upon the tissues of the human female, and this effect permits the device to perforate the uterus and migrate to other parts of the body.

> In my opinion the CU–7 is an inherently dangerous device inappropriate for implantation in the female uterus.

As the trial court recognized, Dr. Baier's affidavit avers nothing about plaintiff's condition, where the Cu–7 was found in her, or other possible causes of the Cu–7's mislocation. Indeed, Dr. Baier had not examined any of plaintiff's medical records and was not familiar with the particular circumstances of her complication. Nor does his affidavit indicate that the copper used in his experiment with rabbits was the same kind, shape, or size used in the Cu–7.

Given these facts and Dr. McQuarrie's affidavit, it cannot be concluded that an inference of Searle's liability can be deduced from common experience and knowledge. Accordingly, res ipsa loquitur is not sufficient to create a factual issue as to causation in this case.

## III. EVIDENCE OF CAUSATION

■ Notwithstanding our conclusion above that res ipsa loquitur is not sufficient to create a material issue of fact as to causation, there is more to plaintiff's causation argument than simple reliance on res ipsa loquitur. Even though Dr. Baier's statements that the properties of the Cu–7 are "inherently dangerous" and "inappropriate for implantation in the human uterus" do not alone create an issue of fact as to causation, the record contains other evidence which, when taken together with Dr. Baier's affidavit, is sufficient to create an issue of fact as to causation.[2] Dr. Porter stated in his deposition that his examination of plaintiff disclosed that the Cu–7 was in a proper position two weeks after implantation. That observation tended to exclude the possibility that improper implantation was a probable cause of the injury. Although Dr. Porter's testimony was not conclusive as to the actual location of the IUD at the time of the examination, his testimony, together with Dr. Baier's assertion that the Cu–7 was inherently dangerous and inappropriate for implantation, raises a material issue of fact as to causation. In reaching this conclusion, we are

2. We note that affidavits of experts are insufficient to defeat summary judgment unless foundational facts are set forth supporting their opinions and conclusions. *See Butterfield v. Okubo*, 831 P.2d 97, 104 (1992) (experts' affidavits must assert specific facts to support the expert's conclusion). In *Reagan Outdoor Advertising, Inc. v. Lundgren*, 692 P.2d 776 (Utah 1984), we stated that the major purpose of summary judgment is "to avoid unnecessary trial by allowing the parties to pierce the pleadings to determine whether there is a genuine issue to present to the fact-finder." *Id.* at 779. Similarly, in *Walker v. Rocky Mountain Recreation Corp.*, 29 Utah 2d 274, 508 P.2d 538 (1973), this Court affirmed a summary judgment because the opposing affidavit revealed no evidentiary facts and reflected only unsubstantiated opinions and conclusions.

Dr. Baier's affidavit lacks the necessary foundational facts. He refers to no clinical or other experience with the Cu–7, no statistical data regarding problems with the device, and no literature or research conducted with respect to the Cu–7. He made no estimate as to how long it might take the Cu–7 to perforate the uterus, if indeed it would. Dr. Baier's study on the effect of pure metallic copper upon an animal's tissue by implanting copper under the skin of New Zealand white rabbits was the sole basis for his conclusion that the Cu–7 would have a similar effect upon the tissue of a human female. Despite the defects in the affidavit, we have accepted Dr. Baier's ultimate conclusion that the Cu–7 is inherently dangerous, because Searle did not move to strike his affidavit.

guided by the general judicial policy that favors a trial on the merits when there is some doubt as to the propriety of a summary judgment. *See Bowen v. Riverton City,* 656 P.2d 434 (Utah 1982).

In sum, we hold that Searle has not demonstrated the absence of a material issue of fact as to whether the Cu–7 was the cause of plaintiff's injury.

## IV. DOCTRINE OF SHARED CONTROL

Plaintiff's arguments for reversing summary judgment raise another issue that requires discussion. Plaintiff argues that defendants must assume the burden of explaining who caused the injury because it is impossible for her to prove which of the two defendants is liable.[3] Although summary judgment must be reversed, we address the argument because this issue has been raised here and will likely be asserted at trial.

■ An unexplained and unexpected injury can be the basis for requiring multiple defendants collectively in control of the circumstances to explain how the injury occurred. The doctrine of shared control is, however, an exception to the general rule that "the plaintiff does not make out a preponderant case against either of two defendants by showing merely that the plaintiff has been injured by the negligence of one or the other." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 39, at 251 (5th ed. 1984) (footnote omitted). The general rule applies in res ipsa loquitur cases.

In *Ballow v. Monroe,* 699 P.2d 719, 723 (Utah 1985), we reiterated that res ipsa loquitur does not establish a presumption of negligence, either rebuttable or irrebuttable, and does not shift the burden of producing evidence. The burden of proof principle stated by Professor Keeton and the *Ballow* court, that the plaintiff generally has the burden of producing evidence against multiple defendants, was applied in *Talbot v. Dr. W.H. Groves' Latter–Day Saints Hospital, Inc.,* 21 Utah 2d 73, 440 P.2d 872 (1968). There, the plaintiff suffered an injury to an arm because of a lack of blood supply to the nerves after back surgery. The Court refused to apply res ipsa loquitur against a number of defendants who had successive management, control, or partial control of the plaintiff during and after the surgery, because the injury could have been caused by an act or omission of any one of the defendants outside the observation of the others.

■ We have, however, narrowed and carved out exceptions to this general rule. In *Dalley v. Utah Valley Regional Medical Center,* 791 P.2d 193, 200 (Utah 1990), the plaintiff suffered a burn on her leg during a caesarean operation. The evidence showed that the burn occurred while the plaintiff was unconscious in the operating room, but did not show who or what caused the burn. The evidence was clear that the operating staff was responsible for all probable causes of the injury. Application of res ipsa loquitur in that case was based on the inference, logically based on the common experience and knowledge of lay persons, that a patient does not suffer that kind of injury during a caesarean operation absent negligence on the part of the medical staff. We modified the rule in *Talbot* by holding that "all defendants who are charged with the safety of a helpless patient may be held liable where the only possible instrumentalities that could cause injury were within the defined area of an operating room under the control of all defendants...." *Id.* at 200. Thus, *Dalley* stands for the proposition that

---

**3.** The rule imposing liability on two or more defendants who are concurrently negligent but only one of whom could have actually caused the injury was applied in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). That rule is not applicable here, however. In *Tice,* it was clear that both defendants acted negligently in precisely the same manner and that one of the two defendants had to have been responsible for the plaintiff's injury. In the instant case, plaintiff argues that at least one of the defendants must have been negligent. Plaintiff does not argue that both defendants necessarily were negligent. Even if both were negligent, their negligence would be based on different circumstances. Also, if one were guilty of a breach of a legal duty, it is likely that the other would not be.

when the second element of the res ipsa foundation rests on the defendants' exclusive management or control of all possible causation factors, the burden of producing evidence does change.

The case now before this Court, however, is different from *Dalley.* Here, plaintiff has sued two defendants, a doctor and a medical device manufacturer. The liability of each, if any, is separate and independent from the other. Plaintiff has not established exclusive management or control by defendants of the possible causative factors that would justify shifting the burden of producing evidence in this case.

Shifting the burden in *Dalley* was justified because the inference was strong that the injury had occurred while the plaintiff was within the observation and control of all the defendants. Here, Searle had no knowledge of the care with which Dr. Porter inserted the Cu–7 and certainly no control over the process. Dr. Porter had no knowledge of Searle's research and manufacturing process and no control over Searle. Plaintiff therefore is not entitled to rely on the shared control exception.

Reversed and remanded.

HALL, C.J., and HOWE, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, J., concurs in the result.