**Michael ROBB, as guardian ad litem for Jayci Robb, Plaintiff and Appellant,**

v.

**Barry ANDERTON, M.D., Defendant and Appellee.**

**No. 920770-CA.**

Court of Appeals of Utah.

Nov. 5, 1993.

Raymond A. Hintze (Argued), Midvale, for plaintiff and appellant.

Elliot J. Williams (Argued), Bruce H. Jensen, Williams & Hunt, Salt Lake City, for defendant and appellee.

Before BILLINGS, P.J., RUSSON, Associate P.J., and BENCH, J.

## OPINION

BILLINGS, Presiding Judge:

Appellant Michael Robb, guardian ad litem for Jayci Robb, appeals from an adverse bench trial ruling in a medical malpractice action. We affirm.

## FACTS

Jayci Robb, age two months, was scheduled for a craniectomy at Primary Children's Medical Center. Dr. Barry Anderton, a specialist in pediatric anesthesiology, anesthetized Jayci with halothane and nitrous oxide. Once Jayci was asleep, he passed an endotracheal tube into her trachea for the administration of oxygen. Dr. Anderton checked the tube for proper placement and then connected it to a ventilator designed to perform the breathing process.

Dr. Anderton next established an intravenous (IV) line for the administration of fluids and medications into Jayci's bloodstream during surgery. He was assisted by a surgical nurse. The IV line was assembled prior to surgery and filled with fluid by the nurse for Dr. Anderton. Both Dr. Anderton and the nurse testified that while observing fluid dripping through the IV line they carefully inspected the tubing for air bubbles. Observing no air in the line, Dr. Anderton connected the tubing to

a catheter in Jayci's foot. Because the IV system is closed, it remains free of air once it is properly filled with fluid.

Within minutes after completing these procedures and before the actual surgery began, Jayci suffered a cardiac arrest which lasted approximately twenty-three minutes. At the onset of the cardiac arrest, Dr. Anderton noted loud heart tones and a heart murmur. He first checked the position of the endotracheal tube and determined it was appropriately placed. Dr. Anderton next turned off the anesthesia suspecting that Jayci was suffering from a cardiac depression caused by the anesthetic agents. The IV line was also reexamined and was found to be functioning properly. Although Jayci was ultimately resuscitated, she sustained serious permanent injury, including cerebral palsy, spastic quadriplegia and seizures.

At trial, appellant presented the expert testimony of Maurice Zwass, M.D., an anesthesiologist from California. Appellant's theory was that Dr. Anderton had not removed the air from the IV line, which caused Jayci's cardiac arrest. Dr. Zwass testified that in his opinion Jayci's cardiac arrest was likely caused by one of two things: "Either there was some inadvertent venous air given through the IV, I'm not certain as to the exact quantity, or Jayci for some reason experienced a relative overdose of anesthetic agents. Either of which could have resulted in the cardiac arrest." When asked by counsel to render an opinion on which of the two theories he believed was most likely, Dr. Zwass chose the venous air theory because in his experience the presence of loud heart tones is inconsistent with an anesthetic overdose.

Dr. Zwass testified that Dr. Anderton's care, if rendered as described and recorded, complied with the appropriate standard of care. He also testified he had not seen or heard of a case where a cardiac arrest was caused by an infusion of air occurring with an IV line and set-up of the type Dr. Anderton utilized.

The trial court also heard testimony on the standard of care from David Steward, M.D., Dr. Anderton's expert, over the foundational objection of appellant. Dr. Steward is a pediatric anesthesiologist who is the Director of the Anesthesiology Service at the Children's Hospital of Los Angeles, and a professor of anesthesia at the University of Southern California. Dr. Steward completed his medical education and post-graduate training in Canada and England. He is certified by the American Board of Anesthesiology and also holds the equivalent certification in Canada from the Royal College of Physicians. From 1972 to 1984, Dr. Steward was the Director of the Department of Anesthesiology at the Hospital for Sick Children, the largest children's hospital in North America. From 1984 until accepting the position in Los Angeles, Dr. Steward was the Director of Anesthesiology at the British Columbia Children's Hospital in Vancouver. He has been actively involved in the education of pediatric anesthesiologists in both Canada and the United States. As a visiting professor, he routinely supervises anesthesiology residents at medical schools in the United States. Dr. Steward has twenty-three years of experience as a pediatric anesthesiologist and during that time has personally administered anesthesia to approximately 10,000 children, in addition to supervising residents in an estimated additional 10,000 cases.

Dr. Steward testified he is knowledgeable about the standard of care practiced by competent pediatric anesthesiologists in the United States. In his opinion there is very little difference in the standard of care in the United States and Canada.

Based on this foundation, the trial court allowed Dr. Steward to give his professional opinion. Dr. Steward testified that Dr. Anderton complied in all respects with the appropriate standard of care expected of a pediatric anesthesiologist. In Dr. Steward's opinion, the most likely explanation for Jayci's cardiac arrest was a profound myocardial depression resulting from an abnormal response to the combination of anesthetic agents used. He testified the loud heart sounds Dr. Anderton noted were typical of those preceding profound depression of the heart. Further, Dr. Steward

testified that an air embolism was not a possible explanation of Jayci's cardiac arrest. He explained that such an event has not been reported and simply is not possible with an IV apparatus of the type Dr. Anderton used. Additionally, he testified that air in the bloodstream causes damage which would have produced objective signs that were not present in Jayci's case, such as a low platelet count and pulmonary edema.

Dr. Anderton also relied on the testimony of a second expert witness, Richard Moon, M.D. Dr. Moon is board certified in anesthesiology, internal medicine and pulmonary medicine. He is an expert in hyperbaric medicine, which involves the use of oxygen under high pressure to treat patients who develop air bubbles in their blood.

Dr. Moon testified it would take sixteen or more cubic centimeters of air to cause a cardiac arrest in a patient of Jayci's size when administered in an IV line. Dr. Moon measured the entire volume contained in the IV tubing, which would have been the maximum amount of air that could have been introduced through the line, and found it to contain only thirteen cubic centimeters. Consequently, he concluded there could not have been sufficient air in the line to produce an air embolism.

Dr. Moon also described the symptoms of venous gas embolism. He testified that if air had been introduced through the IV line Jayci would have demonstrated several objective signs which were not reported. Dr. Moon testified that it was "inconceivable" that Jayci's cardiac arrest was the result of a large infusion of air into her venous system.

The trial court relied on the testimony of Dr. Anderton's expert witnesses. The court found Dr. Steward and Dr. Moon to "have impressive credentials which are beyond dispute, and were the more competent, credible and persuasive of the experts from whom opinions were received."

Further, the trial court specifically found that Dr. Anderton and the surgical nurse examined the IV line and apparatus at the commencement of the procedure looking for air bubbles and checked the flow of fluid from the IV line prior to its insertion in Jayci Robb to insure that there was no significant amount of air in the line. Defendant's procedure for inspecting the IV line, which was followed in his treatment of Jayci Robb, complied with the applicable standard of care.

The court recognized that "[a] cardiac arrest after induction of anesthesia which leads to an injury such as Jayci Robb sustained in this case can and does occur in the absence of negligence and even with the best of care." The court continued "[t]here are alternative plausible explanations for the cause of the cardiac depression in this case which are not related to any negligence on the part of Defendant." Based on these findings, the trial court refused appellant's demand to apply the doctrine of res ipsa loquitur. The court ultimately determined that Dr. Anderton "clearly complied with the applicable standard of medical care in his treatment and care of Jayci Robb." This appeal followed.

Appellant argues on appeal: (1) Dr. Steward was not competent to testify concerning the standard of care in Salt Lake City; (2) the trial court erred in refusing to apply the doctrine of res ipsa loquitur; and (3) three of the trial court's findings of fact are clearly erroneous.

## I. EXPERT WITNESS TESTIMONY

■ Appellant claims Dr. Anderton's expert witness, Dr. Steward, was not competent to testify about the standard of care for pediatric anesthesiologists in Salt Lake City because he was educated in England and practiced primarily in Canada. Appellant argues that even though Dr. Steward is an eminently qualified pediatric anesthesiologist, he was not competent to testify as an expert in this case because he has never practiced in Salt Lake City nor has he administered the exact combination of anesthetics Dr. Anderton used on Jayci.

Due to the technical nature of a medical doctor's services, "a plaintiff in a medical

negligence case must introduce expert testimony to establish the standard of care by which the doctor's conduct is to be measured." *Anton v. Thomas*, 806 P.2d 744, 745 (Utah App.1991) (citing *Butterfield v. Okubo*, 790 P.2d 94, 96–97 (Utah App.1990), *rev'd on other grounds*, 831 P.2d 97 (Utah 1992)). Under Rule 702 of the Utah Rules of Evidence,[1] "[t]he trial court has discretion to determine the admissibility of expert testimony, and to determine if the witness is qualified to give an opinion on a particular matter." *Anton*, 806 P.2d at 746. This court "will not reverse that determination on appeal in the 'absence of a clear showing of abuse.'" *State v. Larsen*, 828 P.2d 487, 492 (Utah App.1992) (quoting *Lamb v. Bangart*, 525 P.2d 602, 607–08 (Utah 1974)), *cert. denied*, 836 P.2d 1383 (Utah 1992).

Under Utah law an expert witness testifying in a medical malpractice case must be "acquainted with the standards of care in the same or a similar field as the defendant doctor," *Dalley v. Utah Valley Regional Medical Center*, 791 P.2d 193, 195–96 (Utah 1990), and must show a familiarity with that practice in the same or similar locality. *Anton*, 806 P.2d at 746 (refusing to qualify expert witness because no foundation regarding qualification to testify concerning standard of care in Utah). *See Jenkins v. Parrish*, 627 P.2d 533, 537 (Utah 1981) (determining expert witness must be knowledgeable about practice in same or similar locality).

The record supports the trial court's ruling that Dr. Steward was qualified to render an expert opinion regarding the standard of care applicable to Dr. Anderton. Dr. Steward possesses impressive credentials as a pediatric anesthesiologist. He has twenty-three years of experience and has personally administered anesthesia to thousands of children. Dr. Steward has authored numerous publications on pediatric anesthesiology, and serves on the editorial board of several anesthesiology journals used in the United States and Canada.

Dr. Steward testified at trial he was knowledgeable about the standard of care practiced by competent pediatric anesthesiologists in the United States. Indeed, Dr. Steward has considerable experience with pediatric anesthesiology in the United States. He is certified in anesthesiology by the American Board of Anesthesiology, and has been a member of the Committee on Pediatric Anesthesiology of the American Society of Anesthesiologists. At the time of trial, Dr. Steward was the Director of the Anesthesiology Service at the Children's Hospital of Los Angeles, and a professor of anesthesia at the University of Southern California. He was also licensed in the State of California and practicing there.

Furthermore, the record indicates Dr. Steward was familiar with the standard of care for a pediatric anesthesiologist in a teaching children's hospital, such as Primary Children's Medical Center. Dr. Steward has presented lectures on dozens of occasions on pediatric anesthesiology and has supervised anesthesiology residents at many institutions in the United States similar to Primary Children's Medical Center. We do not accept appellant's contention that Dr. Steward is not competent because the record does not establish that he has actually performed the precise procedures using the same anesthetic agents at issue here. Rule 702 only requires an expert to have knowledge, training or education in the area. *See* Utah R.Evid. 702. The record clearly demonstrates Dr. Steward's familiarity with the procedures involved. He explicitly testified the procedures utilized by Dr. Anderton were generally accepted in the profession and met the standard of care. Thus, we cannot say it was an abuse of discretion for the trial court to qualify Dr. Steward as an expert and permit him to testify.

---

1. Rule 702 provides:

    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
    Utah R.Evid. 702.

## II. RES IPSA LOQUITUR

■ Appellant next argues the trial court erred in refusing to apply the doctrine of res ipsa loquitur. In a medical malpractice claim a plaintiff must prove (1) the standard of care (duty), (2) breach, (3) causation, and (4) damages. *Robinson v. Intermountain Health Care, Inc.,* 740 P.2d 262, 264 (Utah App.1987); *accord Dalley v. Utah Valley Regional Medical Ctr.,* 791 P.2d 193, 195–96 (Utah 1990). In exceptional circumstances a plaintiff may use the doctrine of res ipsa loquitur to carry the burden of establishing breach of duty and causation. *Dalley,* 791 P.2d at 195–96; *Robinson,* 740 P.2d at 264. Res ipsa loquitur is an "evidentiary doctrine [that] establishes an inference of negligence from the circumstances incident to the medical treatment." *Robinson,* 740 P.2d at 264; *accord King v. Searle Pharmaceuticals, Inc.,* 832 P.2d 858, 861–62 (Utah 1992). To establish a proper foundation for res ipsa loquitur, the plaintiff must establish three elements:

(1) the accident was of a kind which, in the ordinary course of events, would not have happened had the defendant used due care;

(2) the agency or instrumentality causing the accident was at the time of the accident under the exclusive management or control of the defendant; and

(3) the plaintiff's own use or operation of the agency or instrumentality was not primarily responsible for the accident.

*King,* 832 P.2d at 861; *accord Dalley,* 791 P.2d at 196.

The trial court concluded, and we agree, that appellant failed to establish that the injury in this case was of a kind which in the ordinary course of events would not have happened had the physician used due care. Expert testimony presented at trial certainly supports the court's finding. Dr. Zwass, appellant's own expert, testified that an adverse reaction to anesthetic agents can produce a cardiac arrest and even death despite careful and appropriate care. Dr. Steward· testified that an air embolism was not a possible explanation of Jayci's cardiac arrest. In his opinion, an abnormal response to the combination of anesthetic agents used provided an alternative explanation for Jayci's cardiac arrest. We therefore find no error in the court's refusal to apply the doctrine of res ipsa loquitur.[2]

## III. FINDINGS OF FACT

■ On appeal, appellant challenges three of the trial court's basic findings of fact: (1) that Dr. Anderton examined the IV line and removed any air bubbles prior to insertion; (2) that there could not have been enough air infused through the IV line to have caused Jayci's myocardial depression; and (3) that Dr. Anderton was not negligent.

### A. Removal of Air Bubbles

Appellant first challenges the trial court's finding that Dr. Anderton checked for and removed air bubbles from the IV line prior to insertion.

Utah Rule of Civil Procedure 52(a) provides: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R.Civ.P. 52(a). "A finding attacked as lacking adequate evidentiary support is deemed 'clearly erroneous' only if we conclude that the finding is

---

2. Moreover, even if the trial court had invoked the doctrine of res ipsa loquitur, it was not obligated to find Dr. Anderton negligent. Because res ipsa loquitur "raises only an inference and not a presumption of negligence, the fact finder may choose either to accept or reject that inference." *King v. Searle Pharmaceuticals, Inc.,* 832 P.2d 858, 861 (Utah 1992). In this case, the trial court chose to reject the inference. In the findings of fact the trial court stated:

Even if the doctrine of res ipsa loquitur were applicable in this case, giving rise to an inference of negligence, that inference would not overcome the persuasive force of the evidence provided by the defense and Plaintiff would still not have carried his burden of proof to establish that Defendant was negligent in his treatment and care of Jayci Robb.

against the clear weight of the evidence." *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899–900 (Utah 1989). We review the evidence in a light most favorable to the trial court's findings and affirm if there is a reasonable basis for doing so. *Gillmor v. Gillmor*, 745 ·P.2d 461, 462 (Utah App.1987), *cert. denied*, 765 P.2d 1278 (Utah 1988).

■ As a prerequisite to an appellant's attack on findings of fact, appellant must marshal all the evidence in support of the findings and demonstrate "that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings...." *Grayson Roper Ltd. v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); *see also Reid*, 776 P.2d at 899. The marshaling requirement provides the appellate court the basis from which to conduct a meaningful and expedient review of facts challenged on appeal. *See Wright v. Westside Nursery*, 787 P.2d 508, 512 n. 2 (Utah App.1990).

Here, appellant does not meet his marshaling burden. Instead, appellant argues only selected evidence favorable to his position without presenting the evidence supporting the trial court's finding. We therefore affirm this finding.[3]

### B. Quantity of Air Necessary to Produce Cardiac Arrest

Appellant next attacks the trial court's finding that "[t]here could not have been

sufficient quantities of air infused through the IV line to have resulted in the profound myocardial depression suffered by Jayci Robb in this case." Appellant specifically argues that Dr. Anderton did not establish by credible evidence the quantity of air necessary to cause Jayci's cardiac arrest. Again, appellant fails to meet the marshaling burden he must carry to successfully attack a finding of fact. Appellant does not point to the evidence supporting this finding. Instead appellant simply claims Dr. Moon's opinion is "purely hypothetical and speculative and resulted from an improper application of the animal studies to humans." We therefore affirm this finding.[4]

### C. Negligence

Finally, appellant challenges the court's ultimate determination that Dr. Anderton was not negligent in his treatment of Jayci. He argues the evidence presented at trial instead supports a conclusion that Jayci's cardiac arrest resulted from a massive air embolism.

The trial court's finding of negligence, as a question of fact,[5] will not be overturned unless it is clearly erroneous. *See* Utah R.Civ.P. 52(a). Again, appellant fails to meet the marshaling burden on this issue. Appellant fails to present evidence supporting the trial court's determination and demonstrate that the evidence is insufficient to support it. Instead, he merely presents evidence favorable to his position. We

---

**3.** However, even if appellant had met the marshaling burden, we would affirm on this issue. We cannot say the trial court's finding that Dr. Anderton checked for and removed air bubbles from the IV line prior to insertion into Jayci is clearly erroneous. At trial, Dr. Anderton testified he personally checked the IV line before attaching it to Jayci, and that it was his routine to thoroughly check the IV line for air before putting it in the patient. The nurse also testified he examined the IV line for air prior to handing it to Dr. Anderton.

**4.** Again, even if we were to reach the merits, we would still affirm this finding because we cannot say it is clearly erroneous. At trial, two experts testified it was not possible to infuse

enough air through the IV line to produce a cardiac arrest in Jayci. Dr. Moon testified that the IV tubing could not have contained the volume of air required to produce an air murmur in a patient of Jayci's size. Dr. Steward testified an air embolism is not possible with an IV apparatus of the type Dr. Anderton used, and explained that such an event has never to his knowledge been reported.

**5.** Utah courts have previously considered the issue of negligence, or breach of a legal duty, to be a question of fact. *Kitchen v. Cal Gas Co.*, 821 P.2d 458, 461 (Utah App.1991), *cert. denied sub nom.* 832 P.2d 476 (Utah 1992); *accord Dwiggins v. Morgan Jewelers*, 811 P.2d 182, 183 (Utah 1991).

therefore affirm the trial court's determination that Dr. Anderton was not negligent.[6]

## CONCLUSION

First, the trial court did not abuse its discretion in qualifying Dr. Steward as an expert and permitting him to testify. The record indicates Dr. Steward was knowledgeable about the standard of care to be exercised by pediatric anesthesiologists in hospitals such as Primary Children's Medical Center. Second, the trial court properly refused to apply the doctrine of res ipsa loquitur because appellant failed to prove Jayci's accident was of a kind which, in the ordinary course of events, would not have happened had Dr. Anderton used due care. Third, appellant's challenges to the trial court's findings of fact are insufficient because appellant has not fulfilled the marshaling requirement. Thus, the trial court did not err in determining Dr. Anderton did not breach his standard of care. Accordingly, we affirm.

RUSSON, A.P.J., and BENCH, J., concur.

---

6. Even if appellant had met the marshaling burden, we would still affirm the trial court's determination that Dr. Anderton was not negligent. During the course of the four-day bench trial the court considered testimony from three expert witnesses which supports the determination that Dr. Anderton was not negligent. First, Dr. Steward testified that an air embolism was not a possible explanation of Jayci's cardiac arrest. He testified that Dr. Anderton complied in all respects with the appropriate standard of care expected of a pediatric anesthesiologist. Second, Dr. Moon deemed inconceivable the suggestion that Jayci's cardiac arrest was the result of an infusion of air into her venous system because she demonstrated no objective signs of air in the blood. Finally, Dr. Zwass, appellant's own expert witness, testified that Dr. Anderton's care, if rendered as he described and recorded it, complied with the appropriate standard of care.