**STATE of Utah, In the Interest of G.Y., B.C., S.M., and S.M., persons under eighteen years of age.**

**C.Y., Defendant and Appellant,**

v.

**STATE of Utah, Plaintiff and Appellee.**

**No. 960739–CA.**

Court of Appeals of Utah.

July 2, 1998.

Kristen G. Brewer and Martha Pierce, Salt Lake City, Guardians Ad Litem.

Before DAVIS, P.J., WILKINS, Associate C.J., and GREENWOOD, J.

## OPINION

WILKINS, Associate Presiding Judge.

C.Y. appeals the trial court's final order terminating her parental rights to her four children, G.Y., B.C., S.L.M., and S.Y.M. We affirm.

## BACKGROUND

Appellant, C.Y., is the natural mother of five young children, D.C.,[1] G.Y., B.C., S.L.M., and S.Y.M., born between 1991 and 1996, and fathered by three different men.[2] Appellant has a long history of involvement in the juvenile court both as a child and as an adult. As a child, appellant suffered from mental illness, emotional problems, and dysfunction due to her parents' abuse, neglect, unfitness, and emotional instability. Appellant became a permanent ward of the State when she was nine, was bounced from foster home to foster home, and was institutionalized at a Salt Lake County residential treatment facility for five years. While hospitalized as a teenager, she acted out sexually with other patients and was on anti-psychotic drugs, among others, to control her behavior. Since childhood, appellant has been in and out of mental health treatment centers.

As a parent, appellant has shown a consistent and unchanging pattern of neglecting her children. As a result, the Division of Child and Family Services (DCFS) has assumed custody of all appellant's children in different stages. Appellant first became involved with DCFS in August 1992, when Salt Lake City police put ten-month-old D.C. in shelter after appellant had left the child with a teenage girlfriend at a shopping mall and had not returned after several hours. Appellant agreed to accept state social services under a voluntary foster care plan. Howev-

John E. Laherty, Salt Lake City, for Appellant.

Jan Graham and Jeffrey Buckner, Salt Lake City, for Appellee.

1. D.C. is not a party to this appeal. However, we discuss D.C. in presenting the chronology of events leading to the termination of appellant's parental rights.

2. B.C., S.L.M., and S.Y.M. share the same father; D.C. and G.Y. were fathered by two different men.

er, she participated in peer parent training for only one month, did not visit D.C. regularly, and failed to obtain required housing.

In November 1992, DCFS petitioned for temporary custody of D.C. because appellant left the child with an inappropriate caretaker and was unable to provide care due to her transient lifestyle. The trial court adjudicated D.C. neglected and dependent based on appellant's admission that her emotional, financial, and medical problems impaired her ability to parent, and that she was unable to provide a stable home. DCFS obtained temporary custody of D.C. in April 1993.

Just four days later, appellant gave birth to G.Y. DCFS took protective supervision of the newborn, alleging G.Y. was at risk of neglect. DCFS initially obtained temporary custody of G.Y., but, at the June 1993 pretrial hearing, the trial court granted physical custody of G.Y. to appellant. The trial court ordered appellant to cooperate with DCFS and to complete a psychological evaluation. At trial on December 8, 1993, appellant again admitted that her emotional, financial, and medical problems impaired her ability to parent, and that she was unable to provide stable housing. However, she asserted that she did not have enough time to solve the problems in her home. On December 13, 1993, the juvenile court adjudicated G.Y. neglected, but restored appellant's custody of G.Y. under DCFS's protective supervision. In addition, the court affirmed the prior custodial order with respect to D.C. and ordered appellant to comply with the treatment plans created specifically for each child.

In April 1994, DCFS petitioned to terminate appellant's parental rights to D.C. on the grounds that appellant had failed to comply with three treatment plans, and D.C. had been in foster care for eighteen months. In May 1994, appellant gave birth to B.C. and in June 1994 relinquished her parental rights to D.C.[3]

Shortly thereafter, appellant failed to maintain regular contact with DCFS and started living with her mother. Because appellant had claimed that her mother had prostituted her, DCFS opposed the living arrangement. In September 1994, a DCFS caseworker and a Guardian Ad Litem visited G.Y. and B.C. B.C. appeared very hungry and had a rash. DCFS became concerned about appellant's ability to care for the children and, as a result, in October 1994 petitioned for protective custody of the children. In February 1995, the juvenile court placed the children under DCFS's protective supervision.

In April 1995, appellant gave birth to S.L.M. DCFS then amended the October 1994 petition to include S.L.M. and the juvenile court set trial for July 19, 1995. In June 1995, S.L.M. was hospitalized for a respiratory illness. Appellant was told to keep S.L.M. at home and to keep all doctor appointments. Appellant failed to keep any of the appointments, failed to provide adequate follow-up care for S.L.M., and would not give DCFS the name of the child's doctor to verify that she had kept the appointments. In addition, appellant left the children with teenagers who exposed S.L.M. to cigarette smoke.

In August 1995, appellant moved to the YWCA because she lost subsidized housing. One night after moving, appellant partied at a nearby hotel, kept S.L.M. outside until early the next morning, and fed the baby peppermint water instead of baby formula. On August 24, appellant was evicted from the YWCA for lying, violating rules, and assaulting another resident. That same day, DCFS removed the children from appellant's custody. The children were hungry, dirty, and homeless. G.Y. was infected with head lice, and S.L.M. had a rash and a badly infected sore caked with blood and pus.

After DCFS removed the children from her care, appellant binged on drugs and alcohol. She was hospitalized for a suicide attempt and placed on antidepressant medication. She left the hospital against medical advice to attend the shelter hearing on August 13, 1995. The juvenile court found continued removal necessary based on appellant's expulsion from the YWCA and her resulting homelessness. DCFS took custody of S.L.M. Both B.C. and G.Y. were placed

---

3. DCFS also petitioned to terminate the rights of D.C.'s father based on abandonment. His rights were terminated the same day appellant relinquished hers.

with their respective fathers. Because appellant had made no progress on the previous treatment plan, and in light of her recent hospitalization, the juvenile court ordered appellant to obtain a new psychological evaluation as part of the terms of a new six-month treatment plan created for the period September 1995 to March 1996. In addition to the psychological evaluation, the plan included visitation and required appellant to attend individual therapy, complete a parent education course, and maintain housing and employment. The court scheduled the pretrial hearing for September 11, 1995 and set trial for November 1, 1995.

By September, neither G.Y. nor B.C. were living with their fathers. G.Y. was living with his paternal grandparents and B.C. was in DCFS's custody. On November 1, appellant appeared with new counsel—previous counsel withdrew due to appellant's lack of cooperation—so the court continued the trial until December 6, 1995.

In November 1995, Dr. David Gambles, a psychology resident with Assessment and Psychotherapy Associates (APA), conducted a psychological evaluation of appellant. Dr. Gambles suggested that extreme caution should be taken in deciding whether to return appellant's children to her custody and that, if she did not significantly progress in the near future, it would be in the children's best interest to consider other permanent options. Dr. Gambles evaluated appellant as having a "cannabis dependence," a tendency to neglect her children, a depressive disorder, and a borderline personality disorder with antisocial features. He recommended appellant participate in parenting classes and a drug treatment program and that she submit to random drug testing.

On November 30, 1995, DCFS filed a third amended petition for custody and guardianship of B.C. and S.L.M. After a three-day trial, the juvenile court adjudicated B.C. and S.L.M. neglected and dependent and awarded DCFS temporary custody of the children. In January 1996, the court found that appellant failed to substantially comply with the

treatment plan and terminated reunification services. However, the court ordered DCFS to prepare a new treatment plan for the period January 1996 to June 1996, but required appellant to secure her own services. The plan allowed visitation, required appellant to maintain housing and employment, and required that she participate in individual therapy, parenting classes, and substance abuse counseling.

In the meantime, G.Y.'s father took custody of him. In February 1996, B.C. and S.L.M.'s father unsuccessfully tried to relinquish his rights to the children. In March 1996, DCFS petitioned to terminate appellant's parental rights to B.C. and S.L.M., and the juvenile court set an August trial date. Shortly thereafter, on April 17, 1996, appellant gave birth to S.Y.M. On April 23, DCFS petitioned for custody of S.Y.M. and, on June 5, the juvenile court adjudicated S.Y.M. neglected and awarded DCFS temporary custody. On July 16, 1996, DCFS petitioned to add G.Y. and S.Y.M. to the parental rights termination petition.[4]

In August 1996, appellant's expert, Dr. Juan Meija, re-evaluated her. Dr. Meija opined in his report that termination of appellant's parental rights was not warranted. Dr. Meija's evaluation included, but was not limited to, the following observations. He concluded that appellant had been inappropriately depicted as drug dependent in Dr. Gambles's psychological evaluation. In addition, Dr. Meija acknowledged that appellant had a traumatic childhood, which likely resulted in her psychopathology. However, he was only concerned with appellant's paranoid thinking and somatization, which, in his opinion, did not preclude appellant from meeting her parental responsibilities. Also, he opined that appellant's cognitive limitations do not prevent her from being an appropriate mother and that she was making efforts to learn parenting skills. Finally, he concluded that appellant was trying to change her life to regain custody of her four children.

At the time of trial, appellant was receiving SSI benefits because of her mental and

4. The petition also sought to terminate the parental rights of G.Y.'s father and of B.C., S.L.M., and S.Y.M.'s father.

physical disabilities. She was living with her father because she had no place of her own. During the four-day trial, the juvenile court took judicial notice of all previously adjudicated findings of fact and heard extensive evidence from both parties, including the expert testimonies of both Dr. Gambles and Dr. Meija, and the testimony of Jennie Farr, a DCFS caseworker.

On November 15, 1996, the juvenile court issued its written findings. The court found that DCFS had provided an unusually large number of services to appellant to assist her in completing the service plans. However, despite the services, appellant failed to substantially comply with any of the plans' requirements. Further, the court found no reason to believe that appellant would make any progress in the near future. The court also found that appellant's mental health makes it difficult for her to meet her children's immediate and continuing needs and renders her unable to care for her children without help. As a result, the court found that "the children have all suffered from chronic neglect, unstable housing and relationships, and their mother's lack of parenting skills."

The trial court terminated appellant's parental rights to her four children based on neglect, failure to remedy the circumstances which caused the out-of-home placement, and failure of parental adjustment. *See* Utah Code Ann. § 78–3a–407(2), (4), (5) (1996).

## ISSUES

Appellant does not challenge the sufficiency of the evidence supporting the juvenile court's decision to terminate her parental rights. Instead, appellant asserts the trial court erred both in admitting a psychological evaluation conducted by an unlicensed psychologist and in admitting a DCFS caseworker's testimony in violation of the prohibition on hearsay. Based on this erroneously admitted evidence, appellant argues the juve-

nile court erroneously terminated her parental rights.

## ANALYSIS

### I. Psychological Evaluation

Appellant argues that both Dr. Gambles's testimony and written psychological evaluation of her were inadmissible because Dr. Gambles is not a licensed psychologist as required under Rule 4–903 of the Code of Judicial Administration and, therefore, is not qualified to testify as an expert. The State argues that Rule 4–903 does not apply to proceedings to terminate parental rights, but even if it does, Dr. Gambles, as a resident, is exempt from the licensing requirement under Utah Code Ann. § 58–1–307 (1998).

■ In addressing appellant's argument, we first hold that Rule 4–903 does not apply to proceedings to terminate parental rights.[5] Rule 4–903's stated purpose is to provide courts with uniform guidelines in preparing "custody" evaluations. Utah Code Jud. Admin. R4–903. In preparing such evaluations, the rule specifically requires psychological evaluations to be performed by "psychologists licensed by the state in which they practice." *Id.* However, Rule 4–903 does not state or suggest that the same is required in other contexts, and appellant provides no reason why we should interpret this rule beyond its plainly stated scope. Further, no Utah statute or case law requires psychological evaluations to be done by a licensed psychologist in proceedings to terminate parental rights. Rather, the determination of whether a witness qualifies as an expert is governed by Rule 702 of the Utah Rules of Evidence and is subject to the trial court's discretion. Therefore, we must analyze whether the trial court properly admitted Dr. Gambles's evaluation and report based on his qualifications as an expert witness.

5. Appellant also argues that the trial court erred in admitting Dr. Gambles's testimony where the State failed to establish that Dr. Gambles was in fact "supervised" by "qualified people" as required under Utah Code Ann. § 58–1–307(1)(c) (1998) (providing exemption for residents prac-

ticing under qualified supervision). However, because we hold that Rule 4–903 does not apply, we need not address either party's argument regarding licensing exemptions for residents under section 58–1–307(1)(c).

■ Utah appellate courts have repeatedly recognized that trial courts have considerable discretion over the admission of expert testimony. *See State v. Pearson,* 943 P.2d 1347, 1353 (Utah 1997); *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.,* 909 P.2d 225, 233 (Utah 1995); *Kent v. Pioneer Valley Hosp.,* 930 P.2d 904, 906 (Utah Ct.App.), *cert. denied,* 939 P.2d 683 (Utah 1997); *State ex rel. L.D.S. v. Stevens,* 797 P.2d 1133, 1138 (Utah Ct.App.1990). As such, it is within the trial court's discretion to determine whether a witness qualifies as an expert and to rule on the admissibility of the expert testimony. *See Randle v. Allen,* 862 P.2d 1329, 1337 (Utah 1993). Absent a clear abuse of this discretion, we will not reverse the trial court's determination. *See id.*

■ Appellant asserts the trial court abused its discretion in qualifying Dr. Gambles as an expert witness on the sole ground that he is not a licensed psychologist. Rule 702 of the Utah Rules of Evidence governs the admission of expert witness testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In applying Rule 702, Utah courts have stated that "[t]he critical factor in determining the competency of an expert is whether that expert has knowledge that can assist the trier of fact in resolving the issues before it." *Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 253 (Utah 1985); *see also State ex rel. L.D.S.,* 797 P.2d at 1138. Knowledge, skill, experience, training, or education are the factors to be considered in qualifying an expert. *See* Utah R. Evid. 702; *see also Robb v. Anderton,* 863 P.2d 1322, 1326 (Utah Ct.App.1993) (stating Rule 702 only requires knowledge, training, or education); *cf. Randle,* 862 P.2d at 1337 (holding formal training or education not prerequisite to expert qualification, stating expert may qualify by virtue of experience or training). Licensing, in and of itself, is not dispositive of an expert's qualifications to offer an opinion in any given

area and, therefore, we hold is not a prerequisite to expert qualification under Rule 702.

■ In this case, the trial court properly exercised its discretion in qualifying Dr. Gambles as an expert, despite his resident status, and in admitting his psychological evaluation of appellant. The State properly laid foundation establishing that Dr. Gambles was qualified under Rule 702 to offer expert testimony. The record shows that Dr. Gambles received his bachelor's degree in 1987 and his doctorate in clinical psychology in 1994, both from Brigham Young University. He worked as an intern for one year at Primary Children's Medical Center and is currently a psychology resident employed by Assessment & Psychotherapy Associates, Inc. (APA). He testified that he is supervised by two licensed psychologists and has had experience, both as an intern and a resident, in conducting psychological evaluations. He received formal training in conducting evaluations at Brigham Young University and practical instruction at APA, Primary Children's, and at the Utah State Correctional facility.

■ During trial, appellant requested to voir dire Dr. Gambles, but did not challenge his qualifications. Instead, appellant's voir dire attacked Dr. Gambles's evaluation. Now, on appeal, appellant essentially argues that more weight should have been given to the testimony of her expert, Dr. Meija, who is a licensed psychologist and "well-qualified" to testify. However, we note that a trial court is free to accept or reject an expert's opinion and may accord that opinion whatever weight it deems proper. *See State v. Shickles,* 760 P.2d 291, 302 (Utah 1988). In this case, the court acknowledged the differences in the two experts' opinions and, based on their testimonies and evaluations, concluded that appellant had represented herself differently in each evaluation. For instance, Dr. Gambles assessed appellant as being drug dependent because she told him that she had smoked more marijuana during one of her pregnancies than she ever had in her life. Appellant, however, told Dr. Meija that she occasionally used alcohol or marijuana to relax. Apparently, the court was persuaded by Dr. Gambles's testimony, in addition to

the overwhelming evidence supporting termination, and thus did not rule in appellant's favor. *See Butler, Crockett & Walsh,* 909 P.2d at 233 (noting trial court is accorded "discretion in determining whether a particular witness qualifies as an expert . . . because [the court is] 'in the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole' ") (quoting *State v. Pena,* 869 P.2d 932, 936 (Utah 1994) (other citations omitted)). This was clearly within the trial court's discretion and does not constitute error.

Therefore, we conclude that the trial court properly exercised its discretion in qualifying Dr. Gambles as an expert and in admitting both his written report and testimony regarding his psychological evaluation of appellant.

## II. Hearsay

Appellant also asserts that the trial court erroneously admitted hearsay evidence through DCFS caseworker Jennie Farr's testimony. Specifically, appellant challenges certain portions of Farr's testimony in which she referred to out-of-court statements contained in reports received by DCFS, but prepared by others. Appellant challenges the admission, over her hearsay objections, of six out-of-court statements Farr referred to during her testimony. Appellant also challenges the admission of two Family Support Center letters that evidenced two of six challenged statements. The State asserts that the statements and letters were not hearsay because they were offered and properly admitted for reasons other than to prove the truth of the matter asserted.

Rule 801(c) of the Utah Rules of Evidence defines hearsay as "a statement, other than one made by the declarant . . . , offered in evidence to prove the truth of the matter asserted." Utah R. Evid. 801(c). "However, if an out-of-court statement is 'offered simply to prove that it was made, without regard to whether it is true, such testimony is not proscribed by the hearsay rule.' " *State v. Olsen,* 860 P.2d 332, 335 (Utah 1993) (quoting *State v. Sorensen,* 617 P.2d 333, 337 (Utah 1980)). "To the extent that there is no pertinent factual dispute, whether a statement is offered for the truth of the matter asserted is a question of law, [which we review] under a correction of error standard." *Id.; State v. Perez,* 924 P.2d 1, 2–3 (Utah Ct.App.1996), *cert. denied,* 934 P.2d 652 (Utah 1997).

Farr testified that when she became involved with appellant and her children in November 1994, she reviewed the family's DCFS file, including reports and letters prepared by past caseworkers and the Family Support Center. As the assigned caseworker for appellant and her children, Farr received information from and relied upon several different types of reports and letters, including reports from the Family Support Center containing information regarding appellant's completion of and progress through parenting classes and counseling, reports from appellant's substance abuse evaluator describing appellant's progress and making recommendations, medical reports containing medical information about the children, and the Children's Center mental health reports containing mental health information about the children. During Farr's testimony on direct examination, Farr referred to information that she had received in the above reports and letters. These statements are the basis for appellant's hearsay challenge.

Appellant challenges as hearsay the following six statements made by Farr during her testimony. Farr testified that: (1) she did not request a parent advocate for appellant because Farr had received information from the Family Support Center that appellant had refused to sign consent forms; (2) she monitored appellant's compliance with the treatment plans and received information contained in the first admitted letter from the Family Support Center that appellant had attended but was only minimally involved in the parenting classes; (3) she monitored appellant's compliance and received information in the second admitted letter from the Family Support Center that appellant did not adequately progress in counseling; (4) she believed, based on recommendations from the substance abuse evaluation, appellant was required to participate in individual therapy, which was incorporated in the treatment plans; (5) based upon medical reports made upon the children's removal from ap-

pellant's home, Farr requested special medical services; and (6) based on the Child Center evaluation, she made decisions regarding the children's mental health services. In each instance, the trial court overruled appellant's objection, stating that the statements were not hearsay because they were not offered to prove the truth of the matter asserted. Rather, the statements were offered to explain Farr's actions and to establish that DCFS provided sufficient services. Moreover, the court repeatedly made a specific ruling that it was not making findings about the truth of the underlying "facts" included in the out-of-court statements.

■ As the caseworker assigned to appellant's family, Farr was responsible for providing protective supervision services to assist appellant in maintaining the children in the home. As such, Farr was responsible to give input regarding treatment plans and to assist and monitor appellant's compliance with plan requirements. As the trial court noted, DCFS "doesn't do any of the direct medical or psychological care," but DCFS and its caseworkers are responsible for collecting the reports and required to make decisions based upon them. Clearly, a caseworker is entitled to rely upon such reports in performing the function of helping parents comply with treatment plans, monitoring parental progress, and in making decisions in the children's best interest. To the extent the out-of-court statements contained in the reports are offered for a purpose other than to prove the truth of the matter, Farr's testimony in reference to these statements is not hearsay. *See State v. Collier*, 736 P.2d 231, 234 (Utah 1987) (holding officer's testimony as to conversation with confidential informant was not hearsay because admitted to explain police conduct); *State ex rel. L.D.S.*, 797 P.2d at 1138 (holding caseworker's testimony as to conversation between caseworker and parent regarding children's statements not hearsay where used to show chronology of events). However, if offered to prove the truth of the matter, such out-of-court statements contained in the reports are hearsay. Thus, to be admissible, the reports themselves must fall within one of the exceptions to the hearsay rule, *see, e.g.*, Utah R. Evid. 803(6) (records of regularly conducted business), Utah R. Evid. 803(8) (public records and reports), and be supported by sufficient foundation. *See State ex rel. W.S.*, 939 P.2d 196, 200 (Utah Ct.App.1997), (listing foundational requirements for admission under Rule 803(8)), *cert. denied*, 953 P.2d 449 (Utah 1997); *Klinger v. Kightly*, 889 P.2d 1372, 1376–77 (Utah Ct.App.1995) (listing foundational requirements for admission under Rule 803(6)).

■ Upon reviewing the transcript, we conclude the trial court properly admitted the out-of-court statements about which Farr testified. Farr testified that she had received information that appellant had refused to sign consent forms to explain why Farr did not get a parent advocate for appellant. Farr's testimony regarding appellant's failure to complete parenting classes and failure to progress in counseling was offered not to prove that these statements were true, but because, as a caseworker, Farr was required to monitor and report on appellant's progress and because it was information that formed the basis of Farr's treatment plan evaluations, recommendations, and subsequent actions. Further, Farr stated that the substance abuse evaluation required appellant to attend individual therapy to explain her understanding of the treatment plan requirements. Finally, the out-of-court statements regarding the results of the children's medical exams and Child Center mental health assessments were offered to explain why Farr sought special medical services for the children and why she made certain decisions regarding the children's mental health services. Therefore, we conclude that each statement was used to explain Farr's actions in performing her duties as a DCFS caseworker, and not to prove the truth of the underlying allegations against appellant.

■ Appellant also contends that the trial court violated her right to due process by denying her the opportunity to confront and cross-examine adverse witnesses. Because Farr had no personal knowledge of the substance of the reports, appellant argues that she was deprived of any meaningful cross-examination of those who prepared the reports and the contents of those reports. It

**86**

is well settled that juvenile court procedures must conform to the fundamental requirements of due process. *See In re Gault,* 387 U.S. 1, 19–21, 87 S.Ct. 1428, 1439–40, 18 L.Ed.2d 527 (1967). However, we determined that the out-of-court statements introduced through Farr's testimony were not hearsay. Because the out-of-court statements were not admitted for the truth of the matter asserted, appellant was not denied any opportunity to confront or cross-examine the declarant. In this circumstance, Farr was the declarant, testifying to her own actions, and her statements were subjected to appellant's cross-examination.

### CONCLUSION

We hold that Rule 4–903 of the Utah Code of Judicial Administration, which requires all psychological evaluations to be done by licensed psychologists, applies only to custody evaluations. Further, under Rule 702 of the Utah Rules of Evidence, licensing alone is not a prerequisite for expert qualification. In this case, based on Dr. Gambles's formal education, training, and experience, the trial court properly qualified Dr. Gambles as an expert, despite his resident status, and properly admitted his psychological evaluation of appellant.

Because Farr's testimony as to the six out-of-court statements was not hearsay—as they were offered to explain actions Farr took in performing her duties as a caseworker and to establish that sufficient services were offered—the trial court properly admitted Farr's testimony. Finally, because we conclude that there was no error, appellant's cumulative error argument is without merit.

We affirm the trial court's order.

DAVIS, P.J., and GREENWOOD, J., concur.